**Janis NELSON, Plaintiff,**

v.

**ASSOCIATED PRESS, INC.; Newsweek, Inc.; Pete Axthelm; News America, Inc.; Knight-Ridder, Inc.; and Tim Pallesen, Defendants.**

No. 83–8219–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Aug. 21, 1987.

Louis D. Bruno, Bruno & Sommers, Albany, N.Y. and Edna L. Caruso, P.A., West Palm Beach, Fla., for plaintiff.

Margaret Blair Soyster, Diane Boenig Cavanaugh, Rogers & Wells, New York City and Joseph P. Averill, Miami, Fla., for The Associated Press.

F. Kendall Slinkman, West Palm Beach, Fla., for plaintiff Janis Nelson.

Sanford L. Bohrer, Laura G. Pula, R. Marcus Cobourn, Thomson Zeder Bohrer Werth & Razook, Miami, Fla., for Knight-Ridder, Inc., Tim Pallesen, and News America Publishing, Inc.

Slade R. Metcalf, Squadron, Ellenoff, Plesent & Lehrer, New York City, for News America Publishing, Inc.

Donald M. Middlebrooks, Thomas R. Julin, Steel Hector & Davis, Miami, Fla., Stephen Froling, The Old Vicarage Helpston, Cambs. England, PE6 7ED, for defendants Newsweek, Inc. and Pete Axthelm.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SPELLMAN, District Judge.

THIS CAUSE comes before the Court after a pre-trial conference in the above-named case. The case was transferred to this division after a pre-trial conference was held before Judge Kenneth L. Ryskamp. At that pre-trial conference, Judge Ryskamp announced limited rulings and entered the same without prejudice to this Court's reconsideration of them during the pre-trial conference it held. All the Defendants have filed motions for Summary Judgment on the defamation claims asserted against them by Plaintiff Janis Nelson.

### I. *Background*

In 1982, Palm Beach, Florida resident Herbert ("Peter") Pulitzer instituted divorce proceedings against his then wife, Roxanne Pulitzer. The trial lasted approximately 18 days, and produced without question some of the most bizarre testimony, including testimony by Mr. Pulitzer of seances engaged in by his wife involving a number of people and a black draped trumpet. Plaintiff, Janis Nelson, is a professional psychic who at one point was Mrs. Pulitzer's confidante, and who later returned to West Palm Beach to testify on behalf of Mr. Pulitzer because of her overwhelming concern for the children of that marriage. The Defendants, Newsweek, Inc. ("Newsweek"), Pete Axthelm ("Axthelm"), The Associated Press ("AP"), Knight-Ridder, Inc. and Tim Pallesen ("The Miami Herald Defendants") and News America Publishing, Inc., publisher of the New York *Post* ("News America") covered and reported on the divorce trial. Axthelm wrote an article published in *Newsweek;*

Tim Pallesen wrote an article distributed over Knight-Ridder's wire service. Plaintiff has sued these Defendants for defamation arising out of their publications covering the trial.

Plaintiff operated a business, Palm Beach Readings, in Palm Beach, Florida, from January 1981 until September 1982. She was licensed to practice various activities including astrology, crystal reading, palm reading, soothsaying and fortune telling. Plaintiff offered services in trance readings, karmic readings, tarot readings and astrological readings. It was through this business that Plaintiff became acquainted with Roxanne Pulitzer, eventually becoming her personal confidante, frequently counseling her regarding problems in her marriage.

The dissolution of marriage proceedings received much notoriety, raising serious issues regarding child custody and various other financial matters. The record reflects that Janis Nelson left Palm Beach voluntarily to avoid any attention directed towards her arising from her association with Mrs. Pulitzer. By September 30, 1982, Plaintiff was incommunicado. Yet, before the trial actually began, Ms. Nelson, a layperson in the law, was convinced to return to Palm Beach to make a statement on behalf of Mr. Pulitzer. The return was motivated in part for her concern for the twin sons and that primary custody of them should not be with Roxanne Pulitzer. At the end of making this sworn statement, she was subpoenoed to appear at the trial. Ms. Nelson gave testimony in open court on three dates. It is undisputed that at no point did anyone before or during the trial testify that Janis Nelson conducted seances involving Roxanne Pulitzer in bed or surrounded by 10 to 15 other people in a bedroom with either a trumpet or a black cape.

As indicated, this Court has chosen to reconsider the merits of Defendants' Motions for Summary Judgment pursuant to Judge Ryskamp's invitation to do so, the Miami Herald Defendants' and News America's Motions for Reconsideration, AP's Motion in Limine concerning Fla.Stat.

Ann. Section 770.01 (West 1986) and Rule 16 of the Federal Rules of Civil Procedure.

This Court is aware that on a Motion for Summary Judgment, the Movant must demonstrate that there exists no dispute as to any material fact in the case. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Fed.R. Civ.P. 56(c). This "burden on the moving party may be discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 242, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Of course, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. Finally, it is now certain that:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.... [There is] no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.... Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex,* 106 S.Ct. at 2552–53.

With these principles as guides, the Court turns to the issues raised by the pleadings.

## II. *Limited Public Figure*

■ The Defendants argue that Janis Nelson is a limited public figure and accordingly may not recover anything against them in the absence of showing "constitutional malice" as that term is defined in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *i.e.,* proof that the defamatory statements were published with knowledge of their falsity or in reckless disregard of the truth. The so-called "limited purpose public figure" or "vortex figure," was born from language in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), wherein the Court recognized the difference between public figures in the classic sense—those who have achieved such pervasive fame or notoriety that they become a public figure for all purposes and in all contexts—as opposed to those individuals voluntarily injected into or drawn into a particular public controversy and thereby become a public figure for a limited range of issues. *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3012. Determining whether an individual, otherwise not a public figure, becomes one for a limited purpose requires the Court to first identify a public controversy and second, inquire into the nature and extent of the Plaintiff's participation in that controversy. *Della-Donna v. Gore Newspapers Co.,* 489 So.2d 72, 76 (Fla.Dist. Ct.App.1986).

Defendants argue that there was a public controversy here and that Plaintiff voluntarily thrust herself into its vortex. First, they argue that the Pulitzer divorce received international coverage and, on the home front, received national attention because of the parties involved, the testimony elicited at trial and also because the proceedings raised novel issues in the area of family law and child custody. Plaintiffs counter this argument, relying on *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), wherein the Court, broadly speaking, announced that divorce proceedings, even among the rich and famous, do not amount to public controversies.

■ Plaintiff is not a limited purpose public figure. Even assuming arguendo that the controversy is a public one, insofar as the Pulitzer divorce may have raised novel issues in areas of family law and child custody so as to remove it from the rule in *Firestone,* this Court is simply not satisfied that Plaintiff voluntarily injected herself into that controversy. Plaintiff left Palm Beach to avoid any further involve-

ment in the controversy. Nelson Deposition at 963. Upon being convinced to return, she was forced to appear in the trial under subpoena. In the Court's opinion, this is not the type of voluntariness contemplated by *Gertz* or *Della-Donna.* Given that Plaintiff is not a limited public figure, she need not establish constitutional malice in order to recover against Defendants; negligence will suffice. *Miami Herald Publishing Co. v. Ane,* 458 So.2d 239, 242 (Fla.1984); *Tribune Co. v. Levin,* 458 So.2d 243, 244 (Fla.1984).[1]

### III. *Associated Press*

Plaintiff's claims against AP stem from various dispatches transmitted by them over their wire service between September 28 to 30, 1982. The dispatches all contained similar statements to the following effect:

> In pretrial depositions, Pulitzer described seances conducted at his home by Ms. Nelson. Mrs. Pulitzer, surrounded by 10 to 15 friends, "would lay on the bed, and at the foot of the bed would be a trumpet with a black cape," Pulitzer said in the deposition.
>
> The seances went on to involve group singing and a strange voice speaking from his wife's mouth, Pulitzer said.

It was not until September 30, 1982 that AP learned that it was not Plaintiff who was involved in these seances described by Mr. Pulitzer. Accordingly, AP transmitted a dispatch on October 1, 1982 which stated:

> In a Pulitzer deposition made available Thursday [September 30, 1982], he [Mr. Pulitzer] describes seances—unrelated to Ms. Nelson—that Mrs. Pulitzer conducted in their home.

On February 1, 1983, Plaintiff's attorney sent a letter to AP which stated in relevant part:

> As a result of her testimony under oath, she [Plaintiff] has been subjected to innumerable defamatory statements accus-

ing her of having conducted seances with 10 or 15 people in bed at one time with a three foot trumpet, having engaged in an act of lesbianism, having stood and watched sex acts and similar type malicious and unfounded statements.... If you did not wire service such stories, then we would appreciate you so advising and informing us of what information you did, in fact, provide to newspapers and magazines. If you did provide such stories to the newspapers and magazines this letter should be considered as placing you on notice of the false nature of same and demanding that you immediately publish a retraction and/or apology.

AP responded to this letter on February 8, 1983 as follows:

> Janis Nelson was mentioned in AP stories based on courtroom testimony. If you will specify alleged errors, we will review the accuracy of the questioned points.

Plaintiff's reply to this letter of February 8, 1983 was the institution of this lawsuit on or about February 24, 1983. AP has moved for summary judgment on the grounds that Plaintiff's letter of February 1, 1983 is insufficient under Fla.Stat.Ann. § 770.01 (West 1986), a condition precedent to maintaining the action. *Ross v. Gore,* 48 So.2d 412 (Fla.1950). This Court agrees.

Section 770.01 states:

770.01. Notice condition precedent to action or prosecution for libel or slander

Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he alleges to be false and defamatory.

---

**1.** Notwithstanding that Plaintiff could recover actual damages against Defendants upon proper proof of the same and after establishing Defendants' negligence, *Gertz* makes it clear that punitive damages may still not be recovered absent a showing of constitutional malice. *Gertz,* 418

U.S. at 350, 94 S.Ct. at 3012. This Court finds nothing in this record to warrant reconsideration of Judge Ryskamp's ruling that Plaintiff has failed to establish constitutional malice and accordingly may not recover punitive damages.

Fla.Stat.Ann. § 770.01 (West 1986).[2]

■ Plaintiff, relying on *Bridges v. Williamson*, 449 So.2d 400, 401 (Fla.Dist.Ct. App.1984) and *Davies v. Bossert*, 449 So.2d 418, 420 (Fla.Dist.Ct.App.1984), first argues that § 770.01 is not applicable to AP, and therefore no notice was even required. Both cases state that § 770.01 is not applicable to a non-media defendant and was therefore held not to be applicable to private individuals whose alleged defamatory statements were republished by the media (*Bridges*), or to a citizen's band radio operator (*Davies*). The express language of the statute reads "newspapers, periodicals or other medium." This Court is of the opinion that the language "other medium," should be read broadly to incorporate wire services like AP.

Assuming the Court held § 770.01 to be applicable to AP, Plaintiff argued that under *Nezelek Inc. v. Sunbeam Television Corp.*, 413 So.2d 51 (Fla.Dist.Ct.App.1982), the notice sent February 1, 1983 was sufficient. *Nezelek* involved oral communications in a television newscast critical of Nezelek's performance as a general contractor. *Nezelek* can certainly be read for the proposition that when the cause of action for defamation is based on oral statements, it is sufficient that the Plaintiff set out the substance of the spoken words in her § 770.01 notice with sufficient particularity, although not verbatim, because the very nature of a broadcast means the Plaintiff does not have the printed statements available at the time of the original demand for retraction. *Nezelek*, 413 So.2d at 56, 57. Plaintiff argues that this rule regarding oral statements ought to apply to AP, because non-members of AP do not have access to the printed word as do members of AP. Plaintiff also claims that the difficulty is compounded because an article which carries an AP byline does not necessarily mean that it was received in its entirety from AP. Accordingly Plaintiff has contended that she was not in possession of the specific articles and was therefore not capable of placing AP on notice of the specific articles in question neither at the

time she sent notice to AP on February 1, 1983 nor after AP's letter to Plaintiff on February 8, 1983. The very complaint upon which this matter was filed and its attached exhibits belie this contention.

On the same day the AP was noticed, February 1, 1983, a notice was also sent to The Miami *Herald*, specifically referring to an article which appeared in The Miami *Herald* on September 29, 1983, containing the precise language now sought to be sued upon. Plaintiff's Complaint, Exhibit I. The very article is attached to Plaintiff's Complaint as Exhibit J, and reflects that it is in fact an AP story. On January 21, 1983, notice was also sent to Defendant News America, pursuant to § 770.01, referring to an allegedly defamatory article in The New York *Post* of November 5, 1982. Plaintiff's Complaint, Exhibit Q. The article referred to is attached as Exhibit P to Plaintiff's Complaint, and reflects that it is an AP article.

Clearly, on the date Plaintiff sent notice to AP she had actual notice of at least two other articles which she claimed defamed her, and could have specifically referred to them and quoted from them verbatim in her notice to AP, yet failed to. In this situation, the Court finds as a matter of law that § 770.01 has not been complied with.

■ Upon review of the relevant case law, the Court is convinced that the statute requires the best possible notice. Thus, there are cases like *Nezelek*, allowing more general notices to be sufficient, because that is the best possible notice where there has been an oral broadcast. The best possible notice in this case would have been, at a minimum, and especially upon receipt of AP's letter of February 8, 1983, to refer to the September 29, 1983 Miami *Herald* article and the November 5, 1983 New York *Post* article, and quote verbatim from them; because the fact is that Plaintiff was capable of doing so. Having failed to comply with § 770.01, Plaintiff's claim against

**2.** The statute read the same at the time Plaintiff initiated this action.

AP must fail, since the statute is a condition precedent to her maintaining the suit.[3]

Notices more specific than that sent to AP have been held insufficient. *See, e.g., Hevey v. News-Journal Corp.*, 148 So.2d 543 (Fla.Dist.Ct.App.1963); *Gannett Florida Corp. v. Montesano*, 308 So.2d 599 (Fla.Dist.Ct.App.1975); *Orlando Sports Stadium Inc. v. Sentinel Star Co.*, 316 So.2d 607 (Fla.Dist.Ct.App.1975). And the reason for such results is simple. The statute is designed to allow a defendant the opportunity to be put on notice so as to take necessary steps to mitigate potential damages and perhaps avoid precisely the type of litigation now before the Court. AP had no such opportunity.

## IV. *Newsweek*

Defendant Newsweek publishes the nationally known news magazine of the same name. Pete Axthelm wrote one of the articles complained of by Plaintiff. Plaintiff's claims against Newsweek arise out of two articles published. One appeared in the October 11, 1982 issue and was authored by David Alpern (the "Alpern" article). It reported in pertinent part:

> In the first week of testimony reports of Roxanne's intimacies ... have come from ... the local psychic whose seances regularly brought Roxanne into bed with 10 or 15 other people and a three-foot trumpet wrapped in a black cape (Is that odd?).

The second article appeared in the January 10, 1983 issue of *Newsweek*. Authored by Defendant Axthelm, it stated in pertinent part:

> When the history of sleaze is compiled, however, this trial will be best known for its trumpet. Peter testified that his wife had seances featuring the black-draped horn. Her psychic, Janis Nelson, also weighed in with corroboration of some of Roxanne's infidelities. The trumpet became the tabloids' smoking gun, the brassy symbol of the delicious irrele-

vance of the entire proceeding. And the psychic's appearance was telling: "It's one thing to be betrayed by your lover," said a woman writer. "But where do you turn when your psychic betrays you?"

### a) *Alpern Article*

▮ The Court is of the opinion that the portion of the article referred to, in the context of the entire paragraph in which it appears, is arguably subject to a defamatory interpretation insofar as it places Plaintiff as the psychic who conducted seances, bringing Roxanne Pulitzer into bed under unique circumstances and as part of the ongoing intimacies referred to. The Court, however, concludes that the article is nonetheless not actionable since Plaintiff has failed to establish a genuine issue for trial regarding the Defendant's negligence.

The article was based on an array of other newspapers and wire service reports. Alpern Affidavit ¶ 5; Exhibit B. Mr. Alpern's uncontradicted affidavit indicates that he relied on an article from The Washington *Post*, dated September 28, 1982, a New York *Daily News* report of September 30, 1982, and also a September 26, 1982 Miami *Herald* article. Alpern Aff., Ex. B, C; Defendant's Motion for Summary Judgment at 9–11. Late Friday night, October 1, 1982, *Newsweek* confirmed their report with a local stringer, Anne Krueger, who was employed by The Palm Beach *Post*. All this occurring prior to the Saturday, October 2, 1982 writing deadline, a deadline imposed on Alpern so that the magazine would be available on newsstands the following Monday. Plaintiff had made herself incommunicado by September 30, 1982 and was therefore unavailable to verify this information.

To refute this showing by Newsweek that their actions were not negligent, Plaintiff argues that Alpern saw, or at least should have seen, prior to publication, the·

---

**3.** When this Court announced its rulings in this case in open Court on July 16, 1987, it was of the mistaken impression that Plaintiff also sued AP for the November 5, 1982 New York *Post* article, perhaps the only one truly defamatory

as to Plaintiff. The Court apologizes for any confusion it may have caused at that time, but still admits consternation as to why that article in particular was never addressed in Plaintiff's February 1, 1983 notice to AP.

twenty-first paragraph of an October 1, 1982 AP report which stated:

In a Pulitzer deposition made available Thursday, he [Peter Pulitzer] described seances—unrelated to Ms. Nelson—that Mrs. Pulitzer conducted in their home.

Plaintiff also argues that Ms. Krueger subsequently retracted her statements with regard to their accuracy. The mere possibility that Newsweek/Alpern should have seen this October 1 report, or know of Ms. Kreuger's subsequent retraction, without more, is insufficient to rebut Defendant's showing of no negligence.

First, there is simply nothing concrete in the record which raises a triable issue as to Alpern's sworn testimony that he had no knowledge of the October 1 report. His affidavit states that at the time he wrote the article, he looked for but was unable to locate contradictory reports in the materials available to him. Second, even if Alpern had the October 1 report, a look at the paragraph in question does not on its face indicate that it is either a retraction or correction of previously published reports, and therefore did not facially, or even implicitly, negate what Alpern had before him at the time he wrote the article. And, third, what is established is that the report was not sent out over the national wire, but went out only over the local Florida wire. Errata Sheet for Sewell Deposition.

Clearly, Plaintiff questions Alpern's credibility, but a desire to cross examine him in the unspecified hope of undermining his credibility won't suffice to avert summary judgment. *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983). Also, Ms. Krueger's affidavit clearly indicates that at the time she gave the contradictory report, she believed that the information was correct. Kreuger Aff. at ¶ 12. Plaintiff chose not to otherwise depose Ms. Kreuger in an attempt to undermine this assertion. In the face of this uncontroverted showing by Newsweek, summary judgment in their favor is proper.

Two additional points support this Court's finding of no negligence on the part of Newsweek with regard to the Alpern article.

First, the Court sees no reason why a defendant such as Newsweek should not be allowed to assert an appropriate form of the wire service defense, heretofore recognized on behalf of newspapers. That defense is probably best enunciated in *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234 (1933). In *Layne*, the defendant was sued for allegedly defamatory statements which were republished from wire service reports. The statements indicated that plaintiff had been indicted for possession of whiskey. The Florida Supreme Court held that where a media defendant can establish that it has relied for its publication upon an established wire service release, the plaintiff must establish that the defendant otherwise acted negligently or be precluded from recovery. The Court stated:

The mere reiteration in a daily newspaper, of an actually false, but apparently authentic news dispatch, received by a newspaper publisher from a generally recognized reliable source of daily news, such as some reputable news service agency engaged in collecting and reporting the news, cannot through publication alone be deemed per se to amount to an actionable libel by indorsement, in the absence of some showing from the nature of the article published, or otherwise, that the publisher must have acted in a negligent, reckless, or careless manner in reproducing it to another's injury.

*Id.* 146 So. at 238. *Accord Appleby v. Daily Hampshire Gazette*, 395 Mass. 32, 478 N.E.2d 721, 725 (1985); *MacGregor v. Miami Herald Pub. Co.*, 119 So.2d 85 (Fla. Dist.Ct.App.1960).

The reason for the defense makes sense. Under common law, one who heard a slander was not libel for repeating it, if he did so in the same words, and at the same time gave in publishing it his authority for the statement made. *Layne*, 146 So. at 238. Necessarily, modern newspapers could not exist without a similar privilege. After all

No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news

gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all.

*Id.* at 239.

The same privilege ought to apply to news periodicals such as *Newsweek*, which very obviously must rely for their sources of information upon other reliable periodicals, newspapers and wire service reports. These periodicals are an integral part of today's news information services, and absent a showing that they are negligent or careless in condensing or summarizing other sources of news information, so as to amount to an independent libel, *MacGregor v. Miami Herald Pub. Co.*, 119 So.2d at 88, thus precluding a court from finding that they relied in good faith on these other sources, they should be afforded a similar defense. Regarding the Alpern article, there is no question that this was done. *Cf. Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir.1986).

Second, Plaintiff has failed to raise a triable issue as to whether Defendants took reasonable precautions to ensure the article's accuracy. This is what is alluded to in *Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir.1983), which, in affirming this Court, stated

> Second, the facts indicate there is no triable issue as to whether the defendants took reasonable precautions to ensure the song's accuracy, particularly in view of their beliefs that Valentine was not part of the conspiracy and that the song did not depict her as being so. Several individuals, including two attorneys, repeatedly reviewed the lyrics. The plaintiff offered nothing to rebut defendant Dylan's deposition testimony that he believed the song did not depict Valentine as a participant in the alleged frame-up. All defendants shared this belief. Nothing in the record contradicts the district court's view in this regard.

*Id.* at 432. Likewise, nothing in this record raises a question regarding the precautions Defendants took which, under *Celotex*, the

Plaintiff is obligated to establish, or be precluded from seeing 12 pairs of eyes.

b) *Axthelm Article*

 This article is also not actionable. It is composed entirely of statements of truth or opinion, and therefore cannot reasonably be interpreted as defamatory. It is elementary that the court must, as a threshhold consideration, make a determination whether a statement is reasonably subject to a defamatory interpretation. *Valentine v. CBS, Inc.*, 698 F.2d 430, 432 (11th Cir.1983); *Silvester v. American Broadcasting Co.*, 650 F.Supp. 766, 770 (S.D.Fla.1986). And in making this determination, the court need not accept an interpretation which is tortured and extreme. *Valentine*, 698 F.2d at 432. The test is whether the common mind would understand the words as reasonably susceptible of a defamatory meaning. *Id.* Plaintiffs also must satisfy the court that the words are capable of interpretation as a false statement of fact; for opinions are protected under the First Amendment. *Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3006–07. Nor does the law require perfect accuracy—the law requires only that the publication be substantially true.

> [N]ewspapers are not to be held to the exact facts or to the most minute details of the transactions they publish ... what the law requires is that the publication shall be substantially true, and that mere inaccuracies, not affecting materially the purport of the article, are immaterial.

*McCormick v. Miami Herald Pub. Co.*, 139 So.2d 197, 200 (Fla.App.1962). A workable test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced. *Id.*

 The first sentence of the Axthelm paragraph is an opinion. The common mind could not accept it otherwise. The second sentence is the truth. Mr. Pulitzer admittedly testified to such in a deposition. Peter Pulitzer Deposition in *Pulitzer v. Pulitzer* at 198–200. The third sentence referring to the Plaintiff is also true. Plaintiff conceded that she testified to such. Nelson Deposition at 1051; Defendants'

Motion for Summary Judgment at 32. The fourth sentence, if not substantially true, given the outrageous testimony and evidence elicited during the Pulitzer divorce proceedings, is certainly an opinion. Even Plaintiff conceded it was proper to make such a statement. Nelson Deposition at 1051. The last sentence is an opinion.

Even if the Court were to accept Plaintiff's tortured interpretation and find that the article was subject to a defamatory interpretation, it still is not actionable; again Plaintiff cannot establish a triable issue regarding the Defendants' negligence.

*Valentine*, as indicated, requires the Plaintiff to establish a triable issue as to whether the Defendants took reasonable precautions to ensure the article's accuracy. *Valentine*, 698 F.2d at 432. Stated in a different way, *Valentine* allows the Defendants to show that they were aware of what might potentially have a defamatory interpretation and rewrite the same to avoid such complications and take the additional step of reviewing the final product with an attorney before publication. Plaintiff argues that despite these attempts, a juxtaposition of the second and third sentences places Plaintiff as engaging in seances of a "pretty hokey" type and, more significantly, that Defendants were already placed on notice of the defamatory and false nature of such statements as a result of the retraction demand letter sent to them regarding the Alpern article.

The uncontroverted testimony provided by Defendants indicates that Mr. Axthelm took Plaintiff's letter regarding the Alpern article into account in preparing his article and substantially redrafted the same to separate Plaintiff from any connection to the seances described by Mr. Pulitzer. Axthelm Affidavit at ¶¶ 10–13; Axthelm Deposition at 45–47, 51–52, 101. He believed

4. Plaintiff reads *Valentine* as requiring, as a threshhold matter, a finding that Plaintiff's interpretation is a tortured one, and argues that such is not the case here. Plaintiff argues that the failure to find such a reading precludes the Defendants from relying on or establishing that they took reasonable precautions to ensure the article's accuracy. Plaintiff's Response at 18–19.

he was successful in doing so, and took the additional step of reviewing the article with a staff attorney. Axthelm Affidavit at ¶ 11. These facts being uncontroverted, Plaintiff is unable to establish a triable issue as to Defendants' fault in failing to take reasonable precautions to ensure the accuracy of the article and under *Celotex*, summary judgment is mandated, since Plaintiff fails to establish a basis upon which to go forward.[4]

### V. *Miami Herald Defendants*

Plaintiff is suing the Miami Herald Defendants collectively on two articles, and Tim Pallesen alone on a third. The first two articles were published by Knight-Ridder in The Miami *Herald* ("The Herald"). The third was initially written by Pallesen, distributed by the Knight-Ridder wire service but republished in an edited form by The Washington *Post* after it received the article from Knight-Ridder. It appears that Pallesen is being sued for the article as it appeared in The Washington *Post*. The *Herald* has subscribed to the AP news service for over 30 years.

The first article at issue was published by Knight-Ridder in The *Herald* Martin County edition on September 29, 1982, and is attached as exhibit J to Plaintiff's Complaint. The article carries the AP byline, indicating its source as Associated Press. There is no question that The *Herald* received the article with the byline from AP. Pallesen did not have anything to do with this article; he took no part in its research, writing, editing, preparation or publication. The article states in pertinent part:

In pretrial depositions, Pulitzer described seances conducted at his home by Nelson. Mrs. Pulitzer, surrounded by 10 to 15 friends, "would lay on the bed, and at the foot of the bed would be a trumpet with a black cape," Pulitzer said in the deposition.

First, this Court does find Plaintiff's interpretation to be tortured. Second, even assuming it was not, the Court reads *Valentine*'s finding that the Plaintiff's interpretation was a tortured one as but one of three alternative grounds upon which this Court was affirmed, and not as a threshhold consideration.

Admittedly, the only change in the article as published from the way it was received from AP is not a material one—the prefix "Ms." preceding Plaintiff's name was not included in the sentences as they appeared in The *Herald*.

If there is ever a situation which gives rise to a Defendant's ability to assert the wire-service defense, this is it. Plaintiff's only argument is that notwithstanding The *Herald*'s republication of these sentences and the article itself carrying the AP by-line, the Defendants are negligent not because there was something inherently improbable on the face of the statements to put them on notice of the article's defamatory content, but rather because they had a duty to otherwise verify the statements. This precise argument has been rejected in the case of *Appleby v. Dailey Hampshire Gazette*, 395 Mass. 32, 478 N.E.2d 721 (1985).

In *Appleby*, Appleby commenced approximately 90 separate actions against various newspapers, radio and television stations and individuals arising from allegedly false and defamatory statements about him arising out of a criminal investigation and resulting in his conviction. The statements were transmitted by both United Press International and AP. Four newspapers republished the wire service reports. The trial court in *Appleby* upheld the republications, recognizing that such republications could not constitute negligence, as a matter of law, unless the article appears on its face to be inherently unreliable. *Appleby*, 478 N.E.2d at 724.

As the Defendants in *Appleby*, these Defendants have admitted that no independent investigation was made on the information received. In fact, in oral argument The *Herald* argued that such a requirement would be impractical. The Court in *Appleby* accepted this argument, stating:

> We think that the inference is inescapable that requiring verification of wire service stories prior to publication would impose a heavy burden on the media's ability to disseminate newsworthy material. "No newspaper could ... assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies," while at the same time publishing timely stories of worldwide or national interest. Because verification would be time consuming and expensive, imposing such a burden would probably force smaller publishers to confine themselves to stories about purely local events. This, in turn, could make it extremely difficult for the smaller newspapers to compete with those publishers who "can afford to verify or to litigate." Moreover, aside from those burdens on the press which a duty of verification would impose, we recognize that society has an interest, embodied in the First Amendment, in avoiding "apprehensive self-censorship" by the news media. In light of all these factors, we conclude that a newspaper ordinarily has exercised "[d]ue care in gathering information," when it publishes material taken from a reputable wire service.

*Appleby*, 478 N.E.2d at 725–26 (citations omitted).

Then, Appleby argued exactly what Plaintiff does here; that while imposition of a duty of verification is generally improper where news originates from a remote source, such is not the case where, as here, it would be easy for Defendants to verify the reports because they are local and therefore independent investigation is feasible. The Court in *Appleby* rejected this argument also:

> [I]t would impose an impermissible burden on the dissemination of news if the media, and the courts, were forced to make subtle distinctions between verifiable and nonverifiable wire service stories. Certainly, many stories which originate locally would be prohibitively time-consuming or expensive to verify, while others which concern remote events could be corroborated by the simple act of placing a long distance telephone call. A publisher could only rarely be completely assured that his assessment of nonverifiability would stand up at trial. Thus, requiring newspapers to distinguish between verifiable and nonverifiable reports would impose the same risks of

"apprehensive self-censorship," as would the requirement that newspapers corroborate all wire service stories before publication.

*Id.* at 726 (citations omitted).

Admittedly, the court recognized that the issues presented by *Appleby* were not wire service reports "so inherently improbable or inconsistent that the defendant had, or should have had, some reason to doubt their accuracy." *Id.* Such is not the case here either, nor has Plaintiff made this argument.

This Court wholeheartedly adopts the analysis of the court in *Appleby* and similarly rejects Plaintiff's "duty-to-verify" argument. After all, the question is not whether the Defendants have to rely on AP, but whether they have a *right* to. The wire service defense is fully consistent with the First Amendment—an Amendment which tolerates occasional, non-negligent mistakes for the sake of getting out the news people want.

 The second article being sued upon is an article written by Tim Pallesen and published in The *Herald* on November 6, 1982. Plaintiff's Complaint, Exhibit K. The language objected to states:

Nelson testified last month that she saw Mrs. Pulitzer share sex and cocaine with Brian Richards, an alleged cocaine dealer, at Richards' apartment.

The Court is of the opinion that this sentence is not actionable either because it is not capable of a defamatory interpretation or because it is substantially true.

The sentence is not capable of a defamatory interpretation. Plaintiff's objection is directed solely to the words "saw sex," insofar as they depict her as a voyeur. *See* Plaintiff's Complaint, Exhibit I at 2. This is a tortured reading of the sentence.

Plaintiff defined a voyeur as "a prying observer who is usually seeking the sordid or scandalous." Transcript of Pretrial Conference at 2–119, line 16–17. "Usually" is defined as "by or according to habit or custom; more often than not; most often; as a rule; ordinarily." Webster's Third New International Dictionary 2524 (unabridged 1981). Thus, Plaintiff must harmonize the word "saw" with the word "usually," because it is the word "saw" which, in Plaintiff's mind, depicts her as a voyeur, a person who is a prying observer *usually* seeking the sordid or scandalous. This is a tortured reading of the words. "Saw" is the past tense of "see." "Saw," in the Court's opinion, does not mean "usually." "Saw" is more temporally defined to one point in time, and not as something equated with "habit or custom." If the sentence had said "frequently saw," "usually saw," "regularly saw," or "enjoyed seeing" (as if on more than one occasion), the Plaintiff might be in a different posture before the Court. But such is not the case. The common mind cannot, as a matter of law, say that "saw sex" equates Plaintiff with voyeurism. "Saw" cannot be construed as depicting Plaintiff as a person who regularly receives sexual pleasure or perverted excitement, as a prying observer, from watching the sordid or scandalous.

 Even if the Court accepts Plaintiff's contention that the sentence depicts her as a voyeur, it would still not be actionable because it is substantially true. As indicated earlier, "newspapers are not to be held to the exact facts ... what the law requires is that the publication shall be substantially true, and that mere inaccuracies, not affecting materially the purport of the article, are immaterial. *McCormick*, 139 So.2d at 200. "A workable test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.*

This test, agreed to by Plaintiff's counsel as the appropriate one to apply, Transcript of Pretrial Conference at 2–136, line 25; 2–137, line 1, is satisfied. First, there is no dispute that while Plaintiff may never have seen Mrs. Pulitzer and Brian Richards actually engaging in sexual intercourse, she unquestionably knew they did, so in the biblical sense of the word, she "saw" it. The parties' joint bilateral pretrial stipulation states:

h. Nelson saw Roxanne Pulitzer and Brian Richards share and consume co-

caine at Richards' apartment and Nelson knew Pulitzer and Richards had sex there that same evening. Nelson did not see the two engage in any sex acts. Nelson testified she waited outside the bedroom in the apartment while Roxanne and Richards went into the bedroom for a "long time," was there when they emerged, with Roxanne zipping up her pants and adjusting her clothes, and asked Roxanne if she and Richards had just had intercourse, to which Roxanne answered in the affirmative. Roxanne Pulitzer and Brian Richards testified they had not had intercourse. The Pulitzer Trial judge concluded in his decision that the sex acts had been committed.

Pretrial Stipulation at 13–14. Given this stipulation, the libel as published would not have had a different effect on the mind of the reader from that which the pleaded truth would have produced, which would have been something to the effect that:

Nelson testified last month that she saw Mrs. Pulitzer share cocaine with Brian Richards, an alleged cocaine dealer, at Richards' apartment, where, according to Nelson, Mrs. Pulitzer and Richards also shared sex. Nelson said she waited outside the bedroom after Richards and Pulitzer went in, observed Pulitzer zipping her fly when she left the bedroom and asked Mrs. Pulitzer if she and Richards had had sex, to which Mrs. Pulitzer replied they had.

Accordingly, the Court holds that the statement as published is substantially true in that, given the stipulation entered into, it would not have had a different effect on the mind of the reader from that which the pleaded truth would have produced.

▮ Finally, Plaintiff is suing Tim Pallesen alone over two sentences in two separate paragraphs in an article published in The Washington *Post* on September 28, 1982. The article carried the byline of Tim Pallesen. Pallesen wrote a story which was distributed by Knight-Ridder to The Washington *Post*. As written by Pallesen and distributed by Knight-Ridder, the article stated:

Islanders say the winner at this trial will be the spouse who best blends allegations of sex, drugs and bizarre behavior. Peter Pulitzer, with Janis the Psychic backing him up, could win the prize. The psychic has agreed to testify for the husband.

"Roxanne would lay on the bed and, at the foot of the bed, would be a trumpet with a black cape," Pulitzer testified in his deposition, describing a bedroom seance regularly attended by 10 to 15 friends.

However, the objected to sentences which constitute the action against Pallesen are two sentences, edited and republished by The Washington *Post*, and which appeared as follows:

Janis the Psychic has agreed to testify for the husband.

"Roxanne would lay on the bed and, at the foot of the bed would be a trumpet with a black cape," Pulitzer testified in his deposition, describing a bedroom seance regularly attended by 10 to 15 friends.

Thus, Pallesen is not being sued for the original wire service report, but rather for language derived from what he wrote which is not exactly the same. This the Court has never understood, because in its opinion the language as republished is more objectionable than Pallesen's original. Yet, for whatever reason, The Washington *Post* was dropped as a party in this suit by the Plaintiff. The Court therefore has limited its inquiry to the article as it was originally written, because it is that language which, if actionable at all, Pallesen is responsible for and not what is republished.

The article was originally written carefully in two separate paragraphs, which by the very nature of paragraphs are intended to convey independent thoughts. Moreover, any statement within each paragraph is either opinion or the truth and therefore not actionable.

The first sentence of the first paragraph is an opinion. The second sentence, if not totally an opinion, certainly is in part substantially true, insofar as Plaintiff did testi-

fy for Mr. Pulitzer. The last sentence is true. Paragraph two is true. Nobody disputes this. Taking these two paragraphs and reading them as two paragraphs does not give rise to a defamatory interpretation as Plaintiff would have this Court believe.

### VI. *News America*

■ Finally, Plaintiff has sued News America, Inc. which publishes The New York *Post* ("The *Post* "). Like The *Herald,* The *Post* has been a subscriber to AP for over 30 years. The suit is based on three articles. The first article was received by The *Post* from AP and was published on November 5, 1982. Plaintiff's Complaint, Exhibit P. The Plaintiff objects to the following language:

> Pulitzer's Lawyer, William Scott, claims "drugs were used and sex was had" there by Mrs. Pulitzer, psychic Janis Nelson and Richards.

As received from AP, the article stated:

> There Peter Pulitzer's attorney, William Scott, claims "drugs were used and sex was had" by Mrs. Roxanne Pulitzer, psychic Janis Nelson and Richards.

Clearly, there are no material differences between that which was published and that which was received from AP.

Plaintiff claims that this statement defames her because she had absolutely nothing to do with any sexual escapades that took place in Mr. Richards' apartment. Unquestionably, Plaintiff, Richards and Mrs. Pulitzer did not have sex together at one time at Richards' apartment. Nobody testified that such was the case either. Plaintiff does not object to the statement indicating that drugs were used there by her, Mrs. Pulitzer and Mr. Richards.

This article is not actionable against this Defendant. News America asserts that this is also a classic situation where they should be afforded protection by the common law wire service defense. This Court agrees. Furthermore, Plaintiffs have failed to establish a triable issue as to Defendants' negligence to preclude them from relying on the defense. Despite the fact that the statements are false and quite arguably defamatory, there cannot be imposed on News America a duty to verify

for the reasons already stated. Nor was there anything so inherently unreliable on the face of the article to put The *Post* on notice of its defamatory content. This is because, admittedly, the Pulitzer trial elicited some of the most preposterous testimony imaginable during the 18 days it lasted. That testimony and the reports following would not have caused any publisher to doubt the accuracy of the statement "and sex was had."

■ The second article was published November 6, 1982. Plaintiff's Complaint, Exhibit R. The byline on that article says "Malcolm Balfour," and clearly involves in all material respects the precise language sued upon from the day before. The language in the Balfour article that is objected to by Plaintiff states:

> Pulitzer's lawyer, Scott, claimed "drugs were used and sex was had" there by Mrs. Pulitzer, psychic Janis Nelson and Richards.

In all material respects, this language is identical to the statement received by AP and published the day before. Plaintiff objects to this article for the same reason she objected to its republication on November 5, 1982 and, aside from the duty-to-verify argument to rebut Defendant's assertion of the wire service defense, which this Court has already rejected, Plaintiff argues that News America cannot rely on the defense because the article did not expressly carry an AP byline. This Court disagrees.

Defendants assert, and there is no indication in this record otherwise, that this article appeared as a result of the AP report which gave rise to The *Post* 's publication the day before. Plaintiff relies on *Layne,* but the Court is of the opinion that such a narrow reading of that case is no longer reasonable, *if in fact such was ever the* reading of that case. Significantly, Plaintiff has not proferred any other cases which read *Layne* so narrowly as to require a wire service byline in all cases or else be precluded from raising the wire service defense, especially in the face of uncontroverted evidence that the article was in fact based on a wire service report.

The critical question regarding this article is not whether Mr. Balfour wrote the statement but rather the nature and reliability of the source. Here, nobody doubts that AP was the source for the objectionable statements. Very obviously, where it can be shown, as it has here, that within hours of an original AP story the materially identical language is used, and where, as here, the Defendants have come forward and established that the previous republication was intended to be used, regardless of the fact that it was under a byline other than AP, *Layne* is satisfied. To get to the jury, especially after *Celotex*, Plaintiff must come forward and create a genuine dispute as to a material fact—in this case that Defendants did not rely in good faith on the wire service defense and otherwise acted negligently or carelessly in doing so. Plaintiff simply has not done this.

Plaintiff's last claim against News America is over an article published December 29, 1982. The article carried the byline of Leo Standora, a re-write person for The *Post*, who compiled the article from other stories previously published by The *Post* and other newspapers and magazines. The objectionable portion of the article is:

Psychic Janis Nelson, who ran Roxanne's seances, added three more men to the list and said she once saw the lady of the house in bed with two lovers—one of whom "threatened my life when I tried to pull him off."

Nelson did not testify at the Pulitzer trial that she saw Mrs. Pulitzer having sex in bed with two men and did not state she pulled a lover off Roxanne which lover then threatened her life. Ms. Nelson did, however, testify at trial that she grabbed Mrs. Pulitzer by the arm when Mrs. Pulitzer was on a couch "making out" with one Hubert Fouret, with the two "laying all over each other," and told her to "get off the couch" and "start acting like a woman." Fouret and Mrs. Pulitzer were fully clothed at the time, and Fouret did not threaten Plaintiff's life at that or any other time. Pretrial Stipulation at 21, ¶¶ q, r.

At least three different lovers of Roxanne Pulitzer did, however, threaten Ms. Nelson's life. Ms. Nelson did testify at trial that Brian Richards told her he was going to kill her and that it was "easy to do away with people" like Nelson. Plaintiff also testified at the Pulitzer trial that James Murdock threatened to kill her, calling her "fat, ugly and a freak." Finally, Plaintiff stated at her deposition in this action that Jacqueline Kimberly threatened her life a couple of times. Mrs. Kimberly was identified at the Pulitzer Trial as having been seen naked in bed with Roxanne Pulitzer. A bartender described seeing Mrs. Kimberly and Mrs. Pulitzer "doing the kind of things you see boys and girls do." Pretrial Stipulation at 21, ¶ s.

Plaintiff's notice to News America was sent on January 21, 1983 and stated:

The statements are totally false and made without any basis in fact. A simple investigation on your part would have disclosed that Janis Nelson had absolutely nothing to do with any sexual escapades that took place in Brian Richards' apartment and most certainly never said in Court or out of Court that she saw Roxanne Pulitzer in bed with two lovers. Nor did she ever state that she pulled a lover off Roxanne who threatened her life. These false and totally fictionalized accounts of a sordid divorce trial which your paper and others like you have provided with international publicity for your own profit motives have subjected our client to grave embarrassment, humiliation, ridicule, mental and emotional distress, and loss of ability to practice her profession.

This letter is written to place you on notice of the falsity of the statements and the damage that they have caused. Demand is made for an immediate retraction and/or apology so that the damage which has resulted to our client may at least be mitigated. Assuming that you are concerned with the distress and injury which you have caused, I will look forward to a copy of your published retraction.

 Clearly, the thrust of Plaintiff's objection go to her being associated with "sexual escapades" that took place at Brian

Richards' apartment; seances are not mentioned at all, and therefore cannot now be the basis for an objection regarding this article for failure to comply with Fla.Stat. Ann. § 770.01.

The remainder of the statement is not actionable, at least not by Ms. Nelson, because it simply is not capable of a defamatory interpretation as to her. Plaintiff, as the notice indicates, argues that the remainder of the article somehow connects her with these sexual escapades; that in effect she did not come upon Mrs. Pulitzer with lovers "accidentally;" that the common mind would see Mrs. Pulitzer in bed with two lovers and Plaintiff pulling a naked man out of bed, Tr. at 2–69; that it might even depict Ms. Nelson as a lesbian. This, in Plaintiff's opinion, is sufficient to get to a jury. This Court disagrees.

The statements complained of do not place Ms. Nelson in bed with anyone or engaging in her own sexual adventures with another person. They expressly refer to Plaintiff seeing "the lady of the house" in bed with others. They do not associate her with lesbianism or voyeurism. These type "sexual escapades" cannot be read into the statements as published without torturing them.

The statement "added three more men to the list" in effect says that Mrs. Pulitzer committed adultery. It is defamatory as to her, assuming at this stage in the game she is capable of being defamed. But it is not capable of a defamatory interpretation as to Plaintiff. Saying another committed adultery does not result in guilt by association to Plaintiff.

The statement that Plaintiff "once saw the lady of the house in bed with two lovers" is similarly not capable of a defamatory interpretation; again, there can be no guilt by association. It does not say anything about Plaintiff enjoying it, participating in it or anything else to connect her with having received some pleasure from it.

The last statement, "one of them threatened by life when I tried to pull him off," is simply not defamatory. It indicates that Ms. Nelson was making genuine attempts to in fact save Roxanne Pulitzer's marriage, which comports with Plaintiff's position throughout trial. It simply is not defamatory to be shown trying to save another person's marriage, which is all this statement does.

Taken together, moreover, the statements in this last claim are substantially true under the different effects test. The pleaded truth would have produced something to the following effect:

> Psychic Janis Nelson, who acted as a medium for Roxanne Pulitzer's communications with spirits, added three men to the list of Roxanne's lovers, and said she once saw Roxane on a bed with two men. One of those men, Brian Richards, threatened Nelson's life, as did two other lovers of Roxanne, James Murdock and Jacqueline Kimberly. On one occasion, Nelson pulled Roxanne off a couch where Roxanne and another man, Hubert Fouret, were "laying all over each other" and "making out."

Comparing this with what was published, this Court is of the opinion that the latter would not have produced a different effect than that which the literal truth would have. Accordingly, summary judgment is proper.

### Conclusion

Accordingly, summary judgment is entered against Plaintiff on all claims asserted. There has been more than ample time for discovery in this case. By this time, Plaintiff should have been able to come forward with a factual issue to present to the jury, not simple assertions that she is entitled to such. Plaintiff cannot get to a jury in the hope of coming up with something; "something" must be shown to exist now for that jury to decide. If the Plaintiff had produced evidence as required by *Celotex* with as much ease as she suggested through her lawyer the tortured, and on occasion perverted, interpretations of the statements at issue, a different result might have been reached.

There is some irony in the Court's result. Some statements that are arguably false and defamatory and sent by AP to others

## 1485

are not actionable against AP for Plaintiff's failure to comply with § 770.01; those same statements are not actionable against the Defendants which republish them because they are protected by the wire service defense. Ironic, yes; but that is the result of the law as applied in the manner required by this Court. The irony does not "smack" of injustice in the federal courts. There is justice in the federal courts, and always will be. Nonetheless, Plaintiff is forced to turn around at the fork in the road; the road to AP must be strictly followed because it is constructed to avoid, in the best of all worlds, precisely this type of litigation. The road to the other Defendants is blocked by aspects of the First Amendment, particularly the protections afforded by the wire service defense, which allows modern newspapers to rely on wire services generally, without which there would not be modern newspapers as we know them.

There is no question but that Plaintiff feels victimized by the nature of these proceedings and this result. But the result is fully protected by the First Amendment and must be understood as a price we pay for upholding a bill of rights which believes that the truth is best arrived at from "uninhibited, robust and wide-open" comment. The First Amendment, unfortunately as it may be, does not otherwise protect Plaintiff's subjective feelings. To allow this case to go to the jury, where Plaintiff cannot establish any triable issue, would truly place "an unjustified and serious damper on freedom of expression." *Appleby*, 478 N.E.2d at 725 (quoting *National Assoc. of Gov't. Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 233, 396 N.E.2d 996, 1004 (1979)).

5. The Court is compelled to address one additional argument raised by Plaintiff, which is that the various statements republished by the Defendants have hurt Plaintiff in a professional capacity; that in effect, the statements have caused a loss of business. The Defendants' argument is simple—if such is the case, prove it.

Especially after *Celotex*, such a position is valid. It is undisputed that Plaintiff has produced no business records or tax returns to support her contention or to establish that she had a business that was profitable. Admittedly, she

Defendants are directed to file a final judgment(s) with the Court within 15 days in accordance with this opinion.[5]

left Palm Beach before the Pulitzer trial ever began, traveling to New Jersey and then Connecticut. Her business was thus closed before any of these articles were published. Any depositions cited in Plaintiff's opposition to Defendants' motions for summary judgment are from clients who did *not* stop associating with Plaintiff because of the articles. There simply is nothing to establish that Plaintiff has suffered a loss of business or has been harmed in her professional reputation.