[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14150

_____

D.C. Docket No. 2:14-cv-01334-RDP

JENNY CONNELL SMITH,

Plaintiff - Appellant,

versus

HAYNES & HAYNES P.C.,
ALICIA K. HAYNES,
KENNETH D. HAYNES,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(October 15, 2019)

Before TJOFLAT and NEWSOM, Circuit Judges, and ANTOON,* District Judge.

---

* The Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

ANTOON, District Judge:

Plaintiff Jenny Smith, a legal assistant, brought this suit against the law firm of Haynes & Haynes P.C. and the firm's named partners, Alicia Haynes and Kenneth Haynes.[1]  In her Amended Complaint, Smith asserted claims against Defendants for unpaid overtime and retaliation under the Fair Labor Standards Act of 1938 (FLSA), breach of contract, and slander.  The district court granted two motions for summary judgment in favor of Defendants.  In its first summary judgment ruling, the district court determined that the overtime, breach of contract, and slander claims were barred by the doctrine of judicial estoppel.  In the second—addressing Smith's retaliation claim—the district court concluded that Defendants' alleged conduct did not constitute adverse action and was not attributable to Defendants.

Smith now appeals.  We affirm the grant of summary judgment on the retaliation claims, but we vacate the summary judgment on the judicial estoppel defense on the authority of *Slater v. U.S. Steel Corp.*, 871 F.3d 1174 (11th Cir. 2017) (en banc) ("*Slater II*"), a case decided after the district court's judicial estoppel ruling.

*I.  Factual and Procedural Background*

---

[1] Because the named partners have the same last name, we refer to them by their first names.

Smith worked for Defendants during two separate time periods. Her first term of employment was from December 2000 until April 2009. During that time, Smith was a regular, salaried employee. In July 2011, Smith began her second term of employment with Defendants. This time, she was hired as an hourly, "contract employee." Although Defendants designated her a contract employee, Smith worked eight hours a day, "Monday through Friday with an hour off for lunch" and "no benefits." Smith became dissatisfied. On several occasions, she asked Defendants to modify the terms of her employment to include payment for overtime. But Defendants did not change Smith's terms of employment, and in December 2012 Smith again left her job with Defendants.

In April 2011—three months before Smith began her second stint with Defendants—an attorney filed a voluntary Chapter 13 bankruptcy petition on Smith's behalf. "Chapter 13 allows a portion of a debtor's future earnings to be collected by a trustee and paid to creditors. A Chapter 13 debtor does not receive a discharge of his debts; rather, the debtor is allowed to extend or reduce the balance of his debts through a plan of rehabilitation." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 n.1 (11th Cir. 2002), *overruled on other grounds by Slater II*.

In her initial bankruptcy schedules, Smith was asked to list "[o]ther contingent and unliquidated claims of every nature." To that prompt, Smith responded, "none." Nothing in the record suggests that this answer was untrue. In

3

August 2011, approximately one month after Smith resumed working for Defendants, the bankruptcy court confirmed Smith's Chapter 13 Plan, which provided for 100% payment to her unsecured creditors. And in January 2013—one month after Smith's employment with Defendants ended—the bankruptcy court dismissed Smith's Chapter 13 case for failure to make the payments required under the Plan.

In July 2014, attorney Russell Parker filed this lawsuit on Smith's behalf. The initial Complaint—signed only by Parker—contained a single claim for unpaid overtime under the FLSA. The Complaint asserted that Smith was misclassified as a "contract employee" and was not paid overtime at the time-and-a-half rate required by the FLSA. In support of that contention, the Complaint specifically alleged that "[d]uring and after her employment, [Smith] spoke with her employers on multiple occasions about being misclassified and not being paid the overtime pay she was entitled to" and that "[d]espite [Smith's] complaints, Defendants did not correct [Smith's] misclassification or award her the overtime [pay] she was owed."

Defendants knew that Smith had filed a Chapter 13 bankruptcy petition. And after Smith filed this action, Defendants checked the bankruptcy court filings. Those records revealed that Smith never amended her bankruptcy schedules to include her request for overtime as a contingent or unliquidated claim. Armed

4

with that information, Defendants consulted attorney John Saxon, another employment lawyer, on how to best use it against Smith.  Saxon recognized that Smith's failure to include her FLSA overtime claim on the bankruptcy schedule might give rise to a judicial estoppel defense.  Saxon, who had over forty years of legal experience, suggested that he meet with Parker, whom he had formerly mentored.  Defendants agreed.

Parker accepted Saxon's invitation, and the two lawyers met at Saxon's office on August 4, 2014.  Unbeknownst to Saxon, Parker electronically recorded the conversation.  The meeting began with Saxon advising Parker that in the future, before filing cases against other lawyers, Parker should attempt to settle, "because it's embarrassing" for a law firm to get sued.  Saxon then told Parker that Parker had "a serious and fatal judicial estoppel problem" with the case because of Smith's failure to disclose her overtime claim to the bankruptcy court.

Saxon further informed Parker that Smith had a potentially embarrassing medical condition and that she had borrowed money from Defendants and not repaid the loans.  He also mentioned that Smith had done work for other lawyers while being paid by Defendants.  Ultimately, Saxon told Parker that if Smith insisted on pursuing the case in the face of her "judicial estoppel problem," the issue would be brought to the court's attention and "there [would] be counterclaims for three different matters"—"stealing time," tortious interference,

5

and the unpaid loans. The gist of Saxon's message was that Parker should persuade Smith to voluntarily dismiss the lawsuit and that if she did not do so, Defendants would file defenses and counterclaims against her. As the meeting ended, Parker told Saxon that he would get back to him within 48 hours.

The individual Defendants, their lawyers, and the principal witnesses in this case were all legal professionals engaged in assisting employees with grievances against their employers. And they were all members of NELA-AL, the Alabama affiliate of the National Employment Lawyers Association. NELA-AL is an organization of Alabama employment lawyers who primarily represent plaintiff-employees in litigation against their employers. With NELA-AL membership come the benefits of continuing education programs, opportunities to discuss litigation strategy, and social events.

Saxon's conversation with Parker spawned a spate of filings. Just two days after that conversation, Barry Frederick and Brandi Frederick (the Frederick firm) filed a Notice of Appearance for Smith. The notice explained that the Frederick firm was representing Smith because of the "retaliatory personal attacks" the Defendants had "initiated and orchestrated." Attached to the notice was a letter from NELA-AL's president, attorney Henry F. Sherrod III. In that letter, Sherrod informed Parker: "Because you are in litigation with two of our members and their firm, the board [of NELA-AL] has decided to suspend your membership until the

6

completion of the lawsuit. I am sure you understand the decision." Parker then filed a motion to withdraw his representation of Smith.

The Frederick firm also filed a motion for an expedited scheduling conference. The stated purpose of that request was to seek court intervention to stem Defendants' attacks on Smith and Parker. In support of the relief sought, the motion claimed that the retaliatory conduct of Saxon and Sherrod rendered them additional potential defendants.

The same day, Saxon filed an answer and affirmative defenses on behalf of Defendants. In the Answer, Defendants denied Smith's assertion that she had spoken to them during her employment about her classification and her request for overtime pay. And two of the affirmative defenses vaguely referred to judicial estoppel. The Second Defense stated, "To the extent the defenses of res judicata, judicial estoppel and collateral estoppel become applicable in this matter[], Defendants assert them in this case." And the Eighth Defense stated that "[Smith's] claims are barred by the doctrine of accord and satisfaction, full payment, estoppel, judicial estoppel, and waiver." The district court entered an order granting Parker's Motion to Withdraw and denying Smith's Motion for Expedited Scheduling Conference.

As promised, Saxon filed a "Motion for Judgment on the Pleadings or for Summary Judgment" seeking a judgment based on the judicial estoppel defense.

7

And within hours, the Frederick firm filed an Amended Complaint on Smith's behalf. The Amended Complaint reasserted the FLSA overtime pay claim and added claims for FLSA retaliation, breach of contract, and slander. The retaliation claims were based on Saxon's threats to file counterclaims and NELA-AL's suspension of Parker. Notably absent from the Amended Complaint was the allegation that Smith, while working for Defendants, had complained about being misclassified and not receiving overtime pay. Instead, the Amended Complaint stated that Smith did not know that she was misclassified and entitled to overtime until after she left employment with Defendants. Before the district court ruled on the Motion for Judgment on the Pleadings or for Summary Judgment, Saxon filed a "Motion to Dismiss, Motion for Judgment on the Pleadings, and Renewed Motion for Summary Judgment" and supporting memorandum of law, again asserting judicial estoppel. This motion superseded the first motion.

In response to that motion, Smith filed a declaration—sworn under penalty of perjury—in which she attested, "During the entire time I worked for [Defendants], I was not aware I was entitled to overtime pay for hours worked over 40 per week." The Declaration also stated that Smith first learned she had a claim for misclassification and overtime pay in March 2014 when communicating with the IRS; that she "did not intend to mislead the court or [her] creditors in [her] Chapter 13 Bankruptcy"; and that she "did not intentionally omit the information

8

about this potential claim against Defendants from [her] bankruptcy forms, because [she] did not know about it before [her] bankruptcy case ended."

Treating Defendants' motion as one for summary judgment, the district court issued a Memorandum Opinion and Order denying the motion as to Smith's retaliation claim but granting it as to her other three claims against Defendants. The district court concluded that Smith's overtime, breach-of-contract, and slander claims were barred by judicial estoppel because Smith failed to inform the bankruptcy court of her claims against Defendants.[2]  The district court additionally found that the inconsistencies between Smith's unsigned Complaint and her unsigned Amended Complaint constituted another basis warranting application of judicial estoppel.  Thus, the district court dismissed all claims except the FLSA retaliation claim.

Following a period of discovery, Defendants filed a motion for summary judgment on the remaining claim for retaliation.  Following a hearing on that motion, the district court issued another Memorandum Opinion and Order granting summary judgment in favor of Defendants.  In doing so, the district court concluded that neither Saxon's oral threats to Parker regarding filing counterclaims nor NELA-AL's suspension of Parker constituted adverse action because the acts

---

[2] The court also determined that Smith's slander claim was barred by the absolute litigation privilege.

9

would not "have 'dissuaded a reasonable worker from making or supporting a charge' against the employer." Moreover, the district court determined that the suspension from NELA-AL was not attributable to Defendants.

On appeal, Smith does not challenge the district court's dismissal of her slander claim. She does, however, appeal the ruling on her overtime and breach of contract claims, arguing that the district court erroneously applied the doctrine of judicial estoppel. She also appeals the district court's summary judgment in favor of Defendants on her FLSA retaliation claim.

## II.  *Standard of Review*

"Generally, we review the granting of summary judgment *de novo*, and the district court's findings of fact for clear error." *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010). "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Talavera v. Sch. Bd. of Palm Beach Cty.*, 129 F.3d 1214, 1216 (11th Cir. 1997) (quoting *Scala v. City of Winter Park*, 116 F.3d 1396, 1398 (11th Cir. 1997)).

Application of the summary judgment standard of review is straightforward as to the district court's second ruling disposing of Smith's FLSA retaliation claim. But "we review the district court's application of judicial estoppel for abuse of discretion." *Robinson*, 595 F.3d at 1273. This is true even though the district

10

judge treated the underlying motion as a motion for summary judgment. *See id.* In explaining why this is so, the D.C. Circuit in *Marshall v. Honeywell Technology Systems, Inc.*, 828 F.3d 923 (D.C. Cir. 2016), noted:

> Ordinarily we review a district court's grant of summary judgment *de novo*. A large majority of the courts of appeals, heeding the Supreme Court's description of judicial estoppel as "an equitable doctrine invoked by a court at its discretion," have adopted an abuse-of-discretion standard rather than *de novo* review . . . . *De novo* review would displace the discretion of the district court to apply judicial estoppel with the discretion of the appellate court to do so. We see no sense in this. We therefore join the majority of circuit courts in holding that the standard of review in this sort of case is abuse of discretion.

828 F.3d at 927–28 (footnote and citations omitted).

Among the appellate decisions cited by the *Marshall* court on this point was *Talavera*. In *Talavera*, this circuit noted that "the language in the few Eleventh Circuit cases involving judicial estoppel is consistent with abuse of discretion review." 129 F.3d at 1216 (citation omitted); *accord Slater II*, 871 F.3d at 1180 n.4; *Robinson*, 595 F.3d at 1273. Thus, the district court's order applying judicial estoppel is reviewed for abuse of discretion.

"An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination or bases an award . . . upon findings of fact that are clearly erroneous." *Mut. Servs. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1322 (11th Cir. 2004) (quoting *Coastal Fuels Mktg., Inc. v. Fla. Express Shipping Co., Inc.*, 207 F.3d 1247, 1252 (11th Cir.

11

2000)); *see also Robinson*, 595 F.3d at 1273 ("An abuse of discretion review requires us to 'affirm unless we find that the district court has made a clear error in judgment, or has applied the wrong legal standard.'" (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc))).

### III.  Discussion

#### A.  Judicial Estoppel

We first address the district judge's ruling that judicial estoppel bars Smith's overtime and breach of contract claims.  Judicial estoppel is an equitable defense to a civil action "intended to protect courts against parties who seek to manipulate the judicial process by changing their positions to suit the exigencies of the moment." *Slater II*, 871 F.3d at 1176.  Because it is "an equitable doctrine, judicial estoppel should apply only when the plaintiff's conduct is egregious enough that the situation 'demand[s] equitable intervention.'"  *Id.* at 1187 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944)).  And the doctrine "should not be applied when the inconsistent positions were the result of 'inadvertence[] or mistake.'"  *Slater II*, 871 F.3d at 1181 (alteration in original) (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)).

#### *1. Inconsistency Between Bankruptcy Omission and District Court Filings*

Judicial estoppel is frequently raised—as it was in this case—against district

court plaintiffs who had earlier sought bankruptcy protection.[3]  In the Eleventh Circuit, a party asserting judicial estoppel must prove just two things—that the plaintiff: "(1) took a position under oath[4] in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system." *Id.* at 1180.  The doctrine does not require a showing that the adverse party relied on the inconsistent statement or was injured by it.  In fact, defendants invoking the defense often have no interest in the bankruptcy proceeding in which the plaintiffs took the prior inconsistent position, except to use it to invoke judicial estoppel as a defense in the district court.  And though the defense is usually raised by civil suit defendants, the doctrine's purpose is to protect the integrity of the court.  *Burnes*, 291 F.3d at 1286.

"When an individual files for bankruptcy, [s]he must file sworn disclosures listing h[er] debts and h[er] assets, including any pending civil claims . . . ." *Slater II*, 871 F.3d at 1176; *see* 11 U.S.C. § 521(a)(1)(B)(i).  That "duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy

---

[3] Roughly 83% of the 237 cases in the Eleventh Circuit—including cases in the circuit, district, and bankruptcy courts—between 2002 and February 22, 2016, that cited *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002), or *Barger v. City of Cartersville*, 348 F.3d 1289 (11th Cir. 2003), for judicial estoppel purposes arose in the bankruptcy context. *See Slater v. U.S. Steel Corp.*, 820 F.3d 1193, 1251–56 app. II (11th Cir. 2016) ("*Slater I*") (Tjoflat, J., concurring).

[4] The requirement that the prior inconsistent statement be made under oath is not "inflexible or exhaustive." *Burnes*, 291 F.3d at 1286.  More important than whether statements are under oath is whether they are intended to mislead and deceive the court.

13

court; rather, a debtor must amend h[er] financial statements if circumstances change." *Ajaka v. BrooksAmerica Mortg. Corp.*, 453 F.3d 1339, 1344 (11th Cir. 2006) (quoting *Burnes*, 291 F.3d at 1286). Under the law of this circuit, the duty to amend applies to Chapter 13 petitioners even after confirmation of the petitioner's plan. *See Robinson*, 595 F.3d at 1274 (holding that under binding precedent of this circuit, the Chapter 13 debtor "had a statutory duty to amend her schedule of assets to reflect her claims against" a defendant in a later civil suit where those claims arose after confirmation of her plan).

Courts consider the omission of a legal claim from a bankruptcy asset schedule to be a denial that the claim exists. And a complaint in district court seeking damages on the same claim is considered an assertion that the claim does indeed exist. *Slater II*, 871 F.3d at 1176. By failing to disclose a pending district court claim to the bankruptcy court, a plaintiff is thus deemed to be taking inconsistent positions. *Id.* And that inconsistency can satisfy the first prong of the judicial estoppel test. Under those circumstances, it is presumably the bankruptcy court that is being deceived and its proceedings that are being manipulated, but judicial estoppel can nonetheless be raised as a defense in the district court.

Before this circuit's decision in *Slater II*, the bar for successful invocation of judicial estoppel in these cases was exceedingly low. A mere showing that the plaintiff knew about the claim or had a potential benefit in not disclosing it

14

triggered an inference that the plaintiff had, in fact, calculated "to deceive the court and manipulate the proceedings," making a mockery of the judicial system ("the *Burnes-Barger* inference").  *Slater II*, 871 F.3d at 1183; *see Burnes*, 291 F.3d 1282; *Barger v. City of Cartersville*, 348 F.3d 1289 (11th Cir. 2003).  The inference was sufficient—it was not necessary for the proponent of application of the doctrine to show that the plaintiff had actual intent to deceive or manipulate.

Not surprisingly, reliance on the *Burnes-Barger* inference sometimes produced perverse results.  District court defendants received the windfall of escaping liability; creditors were denied the benefit of the claim as a bankruptcy estate asset; and bankruptcy courts were stripped of their discretion to determine the effect of the failure to disclose.  *See Slater I*, 820 F.3d at 1210 (Tjoflat, J., concurring).  The only winners were the district court defendants, who ordinarily had no interest in the bankruptcy court proceeding.  And all this without an actual showing that the plaintiff intended to deceive.  "The *Burnes-Barger* doctrine is not an equitable doctrine because its application produces at-least-inequitable results, if not manifestly unjust ones."  *Id.* at 1247.

But *Slater II* revisited how the doctrine of judicial estoppel should be applied in these situations.  In that en banc decision, this circuit left in place the dual requirements—that the plaintiff took an inconsistent position under oath in an earlier proceeding and, in doing so, calculated to make a mockery of the judicial

15

system. *Slater II*, 871 F.3d at 1180. But this circuit overruled the portions of *Burnes* and *Barger* "that permit[ted] a district court to infer intent to misuse the courts" from nondisclosure alone. *Id.* at 1176–77. In rejecting the inference, *Slater II* held that in "determin[ing] whether a plaintiff's inconsistent statements were calculated to make a mockery of the judicial system, a court should look to all the facts and circumstances of the particular case." *Id.* at 1185. "[W]hether a plaintiff intended to mislead the court . . . is separate from and not answered by whether the plaintiff voluntarily, as opposed to inadvertently, omitted assets." *Id.* at 1186.

When the district court made its judicial estoppel ruling in this case, it did not have the benefit of *Slater II*. The district judge accordingly applied the *Burnes-Barger* inference and concluded that Smith's omission constituted an effort to make a mockery of the courts. Because the district court—consistent with *Burnes* and *Barger*—relied on the inference arising from the inconsistent statements, it saw no need for an evidentiary hearing to gauge Smith's credibility in person or to otherwise resolve disputes of fact. Smith's failure to list her claim on the bankruptcy asset schedule was apparent from the record before the district court, and the court determined that the omission in the bankruptcy schedule was inconsistent with Smith's claims in this case—satisfying the first prong of judicial estoppel. The district court then relied on the *Burnes-Barger* inference to show

intent to make a mockery of the courts, satisfying the second prong of judicial estoppel.

But absent application of the *Burnes-Barger* inference—and instead applying *Slater II*'s "all the facts and circumstances" test—it is far from clear that the district court would have (or could have on the record before it) applied judicial estoppel here. There are many facts and circumstances bearing on Smith's intent, beginning with when she learned that she had a legal claim against Defendants. Smith's initial Complaint contains an allegation that "[d]uring and after her employment, [she] spoke with [Defendants] on multiple occasions about being misclassified and not [being] paid the overtime she was entitled to." But Parker—not Smith—signed that document. Whether Smith was the source of this information or whether it was boilerplate language used by Parker to enhance the damages claim or extend the period of the statute of limitations is unknown.[5] In

---

[5] 29 U.S.C. § 260 provides: "In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in [29 U.S.C. §] 216 . . . ."

29 U.S.C. § 255(a) provides: "Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, . . . (a) if the cause of action accrues after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever  barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . ."

17

her sworn declaration, Smith denied that she knew about the claim until after her employment had ended, and Defendants deny that the conversations about overtime pay and classification ever occurred.  Assuming the conversations took place, Smith's request for overtime pay is likely not enough, by itself, to establish knowledge of a legal claim against Defendants.  There is no indication that she spoke to an attorney or conducted her own research to determine that she had an unliquidated legal claim.  Smith did have experience as a legal assistant in employment law, but there is no evidence that she was familiar with the FLSA or IRS regulations.  The only specific evidence as to when she learned of the claim is her declaration, and there she says she was not aware of the claim until after her bankruptcy case was dismissed.

Another factor pertaining to Smith's intent is the nature of the omission itself.  Neither Defendants nor the district court take issue with the truthfulness of Smith's answer on the bankruptcy schedule that she had no contingent claims at the time of filing.  At that point she had not begun her second term of employment with Defendants.  And no evidence was presented below tending to show that Smith was aware of a duty to amend her asset schedule after the bankruptcy court confirmed her proposed plan.  Before Smith filed her bankruptcy petition, whether such a duty existed was a matter of discussion in this circuit.  *See, e.g.*, *Waldron v. Brown (In re Waldron)*, 536 F.3d 1239, 1246 (11th Cir. 2008) ("We do not hold

18

that a debtor has a free-standing duty to disclose the acquisition of any property interest after the confirmation of his plan under Chapter 13.  Neither the Bankruptcy Code nor the Bankruptcy Rules mention such a duty . . . .").

The question whether a Chapter 13 petitioner has a post-confirmation duty to update asset disclosures was put to rest with this circuit's decision in *Robinson*— decided just one year before Smith filed her bankruptcy petition—when the court answered that question affirmatively.  *See* 595 F.3d at 1274.  Thus, while precedent of this circuit imposes a duty upon bankruptcy petitioners to update their asset schedules, it is not clear how Smith would have known of that duty.  Perhaps her bankruptcy lawyer advised her of the obligation, but there is nothing in the record suggesting that.

Then there is the important question of motive.  The district judge mentioned in his written order that Smith had denied motive to deceive the court, but in rejecting that assertion the court mentioned only the supposed inconsistencies in Smith's positions.  The district court did not identify a motive for Smith's failure to update her asset schedules.  In a Chapter 7 bankruptcy, a petitioner is seeking to avoid payment of debt.  And in a Chapter 13 proceeding, a petitioner may seek compromise of the debts owed.  But Smith's Chapter 13 Plan called for her to pay her creditors 100% of the debts she owed, and her debts were not discharged when her bankruptcy case was ultimately dismissed.  If she had a motive for not

19

disclosing the claim, it does not appear to have involved hiding the proceeds she may have hoped to receive as a result of her suit against Defendants. But determination of motive is for the district court in the first instance.

*Slater II*'s rejection of the *Burnes-Barger* inference is a recognition that as a tool of equity, judicial estoppel should serve justice. The results of judicial estoppel are drastic—a party is deprived of the right to pursue a case regardless of the claim's merits. On the other side, a party escapes potential accountability for wrongdoing without regard to the merits of the claim. *Slater II* acknowledges that such extreme measures must rest on the circumstances of the case and not on an inference. *See also Brown v. Swann*, 35 U.S. 497, 503 (1836) (observing that because the goal of equity is to secure justice, it "should not be yielded to light inferences, or doubtful construction"). Here, the district court—lacking *Slater II*'s guidance—relied on the inference. On remand, the district court can and should apply *Slater II* in making its judicial estoppel determination.

*2. Inconsistency Between Complaint and Amended Complaint*

Smith's omission in her bankruptcy proceeding was not the only reason for the district court's judicial estoppel ruling. The district court also found that the doctrine applied because Smith filed inconsistent pleadings in this action.

Smith's initial Complaint referenced conversations with Defendants in which Smith claimed entitlement to reclassification and overtime pay. This

20

allegation was absent from the Amended Complaint, which was followed by Smith's declaration to the contrary.  The Amended Complaint's omission of the reference to the conversations with Defendants conformed to the position Defendants took in their Answer denying that the conversations occurred. Defendants nonetheless argued that this inconsistency in Smith's filings was also a basis for judicial estoppel.  The district court agreed and determined that Smith's pleadings—her Complaint and Amended Complaint—were indeed inconsistent and formed an independent basis for imposition of judicial estoppel.

According to the district court, Smith's "about-face" between the time of her Complaint and Amended Complaint about *when* she became aware of her overtime claim against Defendants constituted two inconsistent positions, advanced at different times during this proceeding, with the intent "to make a mockery of the judicial system."  The district court arrived at this conclusion because, at the time, Eleventh Circuit precedent established by *Burnes* and *Barger* permitted the inference that a party's taking of inconsistent positions meant that the party intended to manipulate the judicial system.  As explained in part III.A.1. of this opinion, this circuit renounced the use of such an inference in *Slater II*, at least in the context of contemporaneous (or near contemporaneous) bankruptcy proceedings and civil litigation.  After *Slater II*, we now require that district courts "consider the totality of the facts and circumstances of the case to determine

21

whether a plaintiff intended to make a mockery of the judicial system" before judicially estopping that party's claim based on an inconsistent bankruptcy filing. *Slater II*, 871 F.3d at 1188.

The same considerations that caused this Court to reject the *Burnes-Barger* inference in an inconsistent bankruptcy filing apply equally to an inconsistent statement in a prior pleading in the same civil proceeding. It is at odds with the purpose and practices of the federal district courts to dismiss a plaintiff's claim wholesale because of inconsistencies in pleadings. In fact, we explicitly permit litigants to assert inconsistent positions when pleading their case. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

Presuming that the claim at issue is meritorious and in compliance with Rule 11, permitting a district court to strike a claim merely because of inconsistencies in the pleadings would be a dangerous precedent to set. First, it would dissuade parties from amending their pleadings for fear of jeopardizing the merits of their entire claim. This would be contrary to the federal procedural rules, which liberally permit parties to amend their pleadings. For example, a party is given 21 days after the service of a responsive pleading or a motion under Rule 12 to freely amend its pleading—a rule deliberately fashioned to allow the original pleader to address "issues that [they] had not considered" presented by the responsive

pleadings.  Fed. R. Civ. P. 15(a) advisory committee's note to 2009 amendment.

Further, while a party may technically amend only once as a matter of right, the

Rules encourage district courts to "freely give leave" for subsequent amendments

"when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Instead of freely giving leave

to adjust the factual underpinning of a pleading, the same-case application of

judicial estoppel would instead encourage district courts to completely dismiss

claims for want of consistency.  And it would encourage—not discourage—

deception by litigants.  It is inconceivable that this is how the federal courts are

supposed to work.

Inconsistencies in a party's statements during litigation are supposed to add

to the adversary process, not destroy it.  For example, prior inconsistent statements

that are made under oath may be used to impeach a witness's testimony on cross-

examination and are explicitly exempted from the usual hearsay prohibitions.  *See*

Fed. R. Evid. 801(d)(1)(A).  When the statements are made by a party, the party's

adversary may introduce them into evidence as admissions.  *See* Fed. R. Evid.

801(d)(2).  And an inconsistent statement as contemplated by these rules can come

from any forum where sworn statements are made; depositions, sworn answers to

interrogatories, and previous proceedings are all fair game.

We want parties to challenge the authenticity and credibility of their

adversaries.  To instead apply judicial estoppel under the circumstances presented

23

here would be to allow inconsistencies to swallow up potentially meritorious claims and dissuade the adversary process. *See Slater II*, 871 F.3d at 1187 (reasoning that the application of judicial estoppel without finding a deliberate attempt to mislead the courts allows "the civil defendant [to avoid] liability on an otherwise potentially meritorious civil claim while providing no corresponding benefit to the court system.").

Inconsistencies in a party's position over time do not threaten the integrity of the federal courts. They signal that it is functioning properly. It was error for the district court to ground judicial estoppel in the inconsistencies between Smith's initial and amended complaints.

## B. Retaliation

We now consider Smith's challenge to the grant of summary judgment in favor of Defendants on her retaliation claim. Smith argues that Defendants conspired with others in taking two actions against Parker that constitute retaliation against Smith. First, Smith claims that NELA-AL wrongfully suspended Parker's membership in the organization. Second, Smith complains that Saxon threatened Parker, stating that if Smith did not dismiss the lawsuit, Defendants would file counterclaims for breach of contract, tortious interference, and "stealing time." The district court correctly granted summary judgment to Defendants as to both of these purportedly adverse actions.

24

In granting Defendants' motion, the district court analyzed the requirements of a cause of action for FLSA retaliation.  The retaliation provision of the FLSA makes it unlawful for an employer to "in any other manner discriminate against any employee because such employee has filed any complaint."  29 U.S.C. § 215(a)(3).  To prove retaliation, a plaintiff must ultimately show: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between [her] activity and the adverse action."  *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000) (quoting *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir. 1997)).

It is undisputed that Smith satisfies the first element of her retaliation claim because the suit against Defendants for violation of the FLSA was a protected activity.  *See* 29 U.S.C. § 215(a)(3).  But that is as far as she can go.  Neither NELA-AL's suspension of Parker nor Saxon's discussion of possible counterclaims passes the governing test for what constitutes adverse action.

As the Supreme Court has explained, not just any adverse action will do; to be adverse, an action taken by an employer must be material.  *Burlington*, 548 U.S. at 57.  To meet the materiality requirement, actions of employers "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.*  The test for materiality is "objective,"

25

though "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 68–69.

Material adverse actions are not limited to those that are directly "related to employment or occur at the workplace." *Id.* In *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), the Supreme Court recognized that under some circumstances, employers' adverse actions against third parties may also qualify as actionable retaliation. [6] The Supreme Court declined to categorically identify relationships susceptible to third-party retaliation, noting that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 175 (quoting *Burlington*, 548 U.S. at 69). Instead, the Court ruled that the objective, *Burlington* "reasonable worker" standard is a good fit. *Id.* In applying that test, courts should consider the nature of the relationship between the third party and the employee, along with the severity of the action taken. *See id.* (explaining that the Court would "expect that firing a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to

---

[6] Although *Thompson* and *Burlington* are Title VII cases, courts have often relied on Title VII retaliation cases when assessing whether conduct constitutes material adverse action under the FLSA. *See, e.g.*, *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *Noack v. YMCA*, 418 F. App'x 347, 353 (5th Cir. 2011); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008).

26

generalize").

### 1. NELA-AL's Suspension of Parker

NELA-AL's suspension of Parker was not materially adverse. This action would not cause a reasonable worker—especially one with employment litigation experience who was no longer working for the accused employer—to back off the prosecution of her case. In fact, that is not what happened. As evidenced by the Amended Complaint and this appeal, Smith doubled down, continuing to zealously prosecute her case against Defendants.

And even if the action qualified as adverse, there is no record evidence indicating that Defendants participated in the NELA-AL decision to suspend Parker. Alicia was the only member of the Defendant firm who was a NELA-AL board member, but she did not participate in the vote. Saxon was also a member of the board and admits that he likely voted in favor of the suspension, but there is no evidence that he did so at the direction or request of Defendants.

True, as Defendants' lawyer, Saxon was their agent; but there is no evidence to support a conclusion he had direct authority to cast a vote to suspend Parker. And while the authority to represent Defendants included the authority to perform "acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it," *Ramos-Barrientos v. Bland*, 661 F.3d 587, 600 (11th Cir. 2011) (quoting Restatement (Second) of Agency § 35), Saxon's vote to suspend Parker

27

does not fall within this scope.  The bottom line is that even though the record permits the inference that Saxon had his client's interests in mind, nothing permits an inference that Defendants expressly or implicitly authorized his vote to suspend Parker from NELA-AL or his encouragement of other board members to do the same.

### 2. *Saxon's Threat of Counterclaims*

We now turn to Smith's assertion that Saxon's threat of counterclaims made during his conference with Parker constitutes actionable retaliation.  It does not.  By that time, the suit was underway.  A reasonable worker would not abandon or compromise a pending lawsuit because counsel for her former employer promised counterclaims if the suit proceeded.  And as noted, Smith—an experienced legal assistant—was in no way deterred by the information that counterclaims would be filed.

Because, in the context of this case, Saxon's statements to Parker—Smith's lawyer—do not constitute material adverse action, we do not address whether threats of counterclaims made by an employer directly to an employee might form the basis of a retaliation claim.  In urging that we do so, Smith relies on this circuit's decision in *NLRB v. U.S. Postal Service*, 526 F.3d 729 (11th Cir. 2008).  Unlike this case, *U.S. Postal Service* involved an employer's threat made directly to an employee after the employee filed an unfair labor practice charge.  *Id.* at 730–

28

31.  Smith also relies on the Supreme Court's decision in *Bill Johnson's Restaurants, Inc. v. NLRB*, a case in which the Supreme Court held that "[r]etaliatory motive and lack of reasonable basis are both essential prerequisites to the issuance of a cease-and-desist order against a state suit."  461 U.S. 731, 748–49 (1983).  But that case also did not involve a threat to file a counterclaim made by one lawyer to another during pending litigation.[7]

## IV.  Conclusion

For the reasons explained above, we affirm the district court's summary judgment in favor of Defendants on Smith's FLSA retaliation claims.  But we vacate the judgment granting Defendants' motion for summary judgment on Smith's FLSA overtime and breach of contract claims and remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED in part, VACATED in part, and REMANDED.**

---

[7] Defendants also contend that Smith's retaliation claim is barred by litigation immunity.  Smith, on the other hand, argues that her retaliation claim survives because the threatened counterclaims were meritless.

Smith's argument raises serious policy questions.  Courts encourage settlements as a matter of public policy to promote amicable resolution of cases and to avoid the expense of litigation.  *See, e.g., Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996) ("[P]ublic policy strongly favors pretrial settlement in all types of litigation because . . . cases . . . 'can occupy a court's docket for years on end, depleting the resources of parties and the taxpayers while rendering meaningful relief increasingly elusive.'" (quoting *U.S. Oil & Gas v. Wolfson*, 967 F.2d 489, 493 (11th Cir. 1992))).  Discussions between counsel regarding the strengths and weaknesses of their clients' positions are essential in reaching settlements.  And courts should be cautious in taking action to chill the willingness of counsel to engage in such discussions.  But we do not reach these issues because Defendants' conduct does not qualify as material adverse action.