[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-14046

_____

JUAN JOSÉ RENDÓN DELGADO,

Plaintiff-Appellant
Cross-Appellee,

*versus*

BLOOMBERG L.P.,
JORDAN ROBERTSON,
MICHAEL RILEY,

Defendants-Appellees
Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:17-cv-21192-KMW

_____

Before BRANCH, GRANT, and LUCK, Circuit Judges.

GRANT, Circuit Judge:

When Bloomberg featured an article about the exploits of a convicted computer hacker who worked in Latin America, one reader was not pleased. Why? In his interview, the hacker alleged that he had carried out numerous cyberattacks on behalf of Juan José Rendón Delgado, a political activist in Latin America. But Rendón says that none of these allegations are true, and filed a defamation complaint.

The district court dismissed Rendón's complaint on several grounds, concluding that the article was protected by a "neutral reporting privilege" and that in any event Rendón had failed to provide pre-suit notice as required under Florida law. We disagree twice over, and reverse and remand in part. The district court also concluded that Rendón's Venezuelan citizenship was sturdy enough to establish alienage jurisdiction, and on that front we agree.

**I.**

Venezuelan-born, Rendón describes himself as an advocate for democracy in Latin America who has advised "successful and upstanding campaigns." (emphasis deleted).  According to his operative complaint, the factual allegations of which we credit at this stage, his career has spanned almost four decades and has taken him to countries including Venezuela, Mexico, Colombia, the Dominican Republic, and Honduras.

Rendón's political activity drew the ire of Venezuelan dictators Hugo Chávez and Nicolás Maduro.[1]  Their mutual campaign against Rendón resulted in the nullification of his Venezuelan passport.  As a result, Rendón was stopped at an airport in Colombia by Venezuelan officials, who claimed his passport was a forgery.  Venezuelan officials later told him that he could not receive a new one because he had been added to a blacklist—individuals banned from receiving government services.  At the Venezuelan consulate, still more officials turned him away, labeling him "a traitor" and "a terrorist."  Rendón was eventually able to cross international borders after acquiring other travel documents, first Colombian and later Honduran.  He now resides in the United States after receiving political asylum in 2016.

---

[1] The United States ceased to recognize the legitimacy of Maduro's government in August 2017.  *PDVSA US Litig. Tr. v. LukOil Pan Ams. LLC*, 65 F.4th 556, 561 (11th Cir. 2023); *see also* Exec. Order No. 13,857, 84 Fed. Reg. 509 (Jan. 30, 2019).

That same year, Bloomberg published an article entitled "How to Hack an Election," by Jordan Robertson, Michael Riley, and Andrew Willis. The article appeared on the *Bloomberg Businessweek* website on March 31, 2016, and was published in the print edition of *Businessweek* and its international edition the following week. The authors and other employees of Bloomberg promoted the article in several TV, internet, and radio interviews.

Most of the article was an interview with Andrés Sepúlveda, a convicted hacker and cyberterrorist, about his work hacking political campaigns in Latin America. Sepúlveda's detailed narrative included work he claimed was on behalf of Rendón. It all began, Sepúlveda told Bloomberg, when he hacked into Rendón's own laptop and stole a client's schedule; the ease with which he carried out the attack convinced Rendón to hire him. Sepúlveda's first task, according to his version of events, was to hack the website of a Colombian client's political rival, stealing e-mail addresses that Rendón could then spam with "disinformation." Another was spoofing phone calls from an opposing candidate at 3:00 a.m. on election day to annoy voters. Sepúlveda's tale of alleged crimes on behalf of Rendón went on and extended as far as Honduras, Mexico, and Guatemala.

As the article noted, Rendón vehemently denies Sepúlveda's accusations. Several months after publication, Rendón's attorney sent a letter to Bloomberg demanding its retraction. The letter referenced by title and date of publication the versions of the article published online and printed in *Businessweek*, and asserted that

Bloomberg had "falsely stated that Mr. Rendón hired Andrés Sepúlveda to 'rig elections throughout Latin America.'" It went on to argue that the article's claims that "Mr. Rendón initiated, directed, and condoned illegal and unethical cyberattacks in order to influence the outcome of high-profile political elections" were false and defamatory. The letter also objected to any allegation that Rendón hired Sepúlveda to commit crimes or perform other "illegal or unethical work." And it countered that Rendón had hired Sepúlveda only once, for a single (legal) web-design project.

Summarizing the objections to Bloomberg's statements, Rendón's letter referenced the "[f]alse allegations in the Article that Mr. Rendón somehow procured, directed, engaged in, or condoned criminal and/or unethical conduct to 'hack' or 'rig' elections throughout Latin America." Finally, it noted that Rendón disputed the account before its publication, asserted that the article relied on an untrustworthy source, and demanded that Bloomberg "retract the Article in its entirety."

Bloomberg refused, and this lawsuit followed. Rendón sued Bloomberg, Robertson, and Riley in the Southern District of Florida, alleging defamation for the online article, the printed *Businessweek* version, and the international edition, as well as each

6                    Opinion of the Court                    19-14046

of four broadcast interviews.[2]  The complaint also included a claim of negligent supervision against Bloomberg.

Bloomberg moved to dismiss for lack of subject-matter jurisdiction because—even though foreign citizenship was required under his theory of jurisdiction—Rendón had failed to allege his own citizenship.  *See* 28 U.S.C. § 1332(a)(2) (establishing jurisdiction for suits between citizens of a U.S. state and citizens of a foreign state).  After Rendón amended his complaint to allege Venezuelan citizenship, the court dismissed the complaint for failure to state a claim.  *Rendón v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269, 1278 (S.D. Fla. 2019).  It concluded that Rendón's suit was blocked by a Florida-law "neutral reporting privilege," which it said shields disinterested reporting about matters of public concern.  *Id.* at 1276–78.  The district court also concluded that Rendón's letter to Bloomberg failed to satisfy Florida's statutory pre-suit notice requirement for defamation claims and dismissed the negligent supervision claim because the underlying tort claims were procedurally barred.  *Id.* at 1273–76.

Rendón appealed.  We first remanded the case to the district court to consider new evidence related to his citizenship.  After jurisdictional discovery, the district court concluded that alienage jurisdiction was proper because Rendón is a Venezuelan citizen.

---

[2] The original complaint also named another Bloomberg employee, *Bloomberg Businessweek*, and Andrew Willis as defendants.  They have since been dropped from the suit.

Now, Rendón's appeal from the order dismissing the case for failing to state a claim is back before us.

## II.

We review rulings on federal courts' subject-matter jurisdiction de novo. *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1239 (11th Cir. 2005). Where "a district court has made jurisdictional factfindings of the parties' citizenships, we review them for clear error." *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013); *Life of the S. Ins. Co. v. Carzell*, 851 F.3d 1341, 1344 (11th Cir. 2017). We review de novo a district court's dismissal of a complaint for failure to state a claim. *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc).

## III.

We first consider the alienage jurisdiction question. That form of diversity jurisdiction covers suits between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2); *see also* U.S. Const. art. III, § 2. Because the "party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction," Rendón must show that he is a citizen of Venezuela and that the defendants are citizens of a U.S. state. *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002); 28 U.S.C. § 1332(a)(2).

In his operative complaint, Rendón alleges that he is and has been since birth a citizen of Venezuela. Bloomberg, for its part,

counters that Rendón's acceptance of foreign travel documents acknowledged his loss of Venezuelan citizenship. Bloomberg also contends that the Venezuelan government stripped Rendón of his citizenship, and says he should be estopped from asserting Venezuelan citizenship because of statements his counsel made during the U.S. asylum process. The upshot of Bloomberg's argument is that Rendón, as a stateless person, cannot qualify for alienage jurisdiction.

We will start by considering the non-Venezuelan travel documents Rendón obtained. Although he received travel documents from Honduras and Colombia after the Chávez regime canceled his Venezuelan passport, those documents do not establish an intent to renounce his nationality. The Honduran document itself clarifies that it "only aims to facilitate the travel abroad of its owner." Likewise, the Columbian document "does not involve acknowledgement of the [C]olombian nationality nor [does] it constitute[] any proof of it and it only has the purpose of facilitating its bearer [in] travelling abroad." Plus, Rendón testified that he did not intend to leave Venezuela "forever" and says he never sought citizenship elsewhere. Rendón's efforts to obtain a new Venezuelan passport after his existing one was revoked, though unsuccessful, also support the district court's finding that he did not intend to abandon his citizenship.

Nor does the record back up Bloomberg's contentions that Venezuela revoked Rendón's citizenship and that the act of state doctrine requires us to honor that revocation. The doctrine bars

courts from questioning the validity of "an official act of a foreign sovereign," but Bloomberg is unable to point us to any specific "act" by Venezuela. *Glen v. Club Méditerranée, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006). To Bloomberg, the nullification of Rendón's passport reveals that Venezuela must have taken an official action that deprived Rendón of Venezuelan citizenship. The problem with that argument is that Bloomberg cites no rule that the loss of a passport is equivalent to denaturalization under Venezuelan law. To the contrary, the record indicates that Venezuelan law *prohibits* the revocation of citizenship. So the only "act" from the Venezuelan government that we need to account for is its nullification of Rendón's passport, which is not itself enough to formally revoke citizenship.

The various informal statements made by the Maduro regime likewise fail to move the needle. Bloomberg points out that when Rendón sought a new passport, embassy workers called him "a traitor" and "a terrorist." And in a speech castigating Rendón as a "criminal" and a "terrorist," Maduro himself referred to Rendón as "countryless." But these statements do not show that Venezuelan officials revoked Rendón's citizenship. At most, they show that the officials thought he was a criminal or a terrorist, neither of which results in loss of citizenship. Rendón was plainly not popular in the regime, but political invective is not the kind of formal process to which the act of state doctrine applies. *See Glen*, 450 F.3d at 1253.

Bloomberg's last argument is that judicial estoppel prevents Rendón from claiming Venezuelan citizenship. That doctrine applies when "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position," but later tries to advance a contrary approach "simply because his interests have changed." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). We "consider the totality of the facts and circumstances of the case to determine whether a plaintiff intended to make a mockery of the judicial system before judicially estopping that party's claim." *See Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 647 (11th Cir. 2019) (quotation omitted); *see also New Hampshire*, 532 U.S. at 749–50.

Bloomberg says statements by Rendón's counsel during an asylum interview, as well as his allegations in the initial complaint, are inconsistent with his assertion of Venezuelan citizenship and estop him from alleging it here. None of them are enough, alone or in combination, to estop Rendón's citizenship claims. We disagree that verbal statements made by Rendón's counsel in an asylum process show that he is attempting to make a "mockery" of this Court. *See Smith*, 940 F.3d at 647 (quotation omitted). Those comments are memorialized in notes taken by a third party, they were made by his attorney and not Rendón himself, there is no evidence that he ever endorsed them, and the attorney may have meant only that Rendón needed asylum because the Maduro regime was not treating him as a citizen.

Nor do the allegations in the original complaint that Venezuela had "declared" that Rendón was "countryless" and stripped him "of his fundamental right to citizenship and nationality" invoke judicial estoppel. (emphasis deleted). To start, they focus on what the Maduro regime "declared," not the legal significance of that declaration. Plus, these allegations were made in an initial complaint that has now been amended several times, so no relief was afforded to Rendón based on those allegations. As a result, Rendón did not "succeed[] in persuading" the court to accept them such that "judicial acceptance of an inconsistent position" later on in the case "would create the perception that" the court "was misled." *New Hampshire*, 532 U.S. at 750 (quotation omitted).

The record, in short, shows that Rendón was born in Venezuela as a Venezuelan citizen. What it does not offer is "proof that he denationalized himself or ceased to be a citizen." *Hauenstein v. Lynham*, 100 U.S. 483, 484 (1880). Rendón is thus "presumed to have continued" to hold the citizenship he had at birth. *Id*. We see no error in the district court's conclusion that alienage jurisdiction is available because Rendón remains a citizen of Venezuela.

## IV.

Turning to the merits, the district court held that Bloomberg's article is protected by a neutral reporting privilege available under Florida law. *Rendón*, 403 F. Supp. 3d at 1276–78. The court also concluded that Rendón failed to satisfy Florida's pre-

suit notice requirement for defamation claims. *Id*. at 1273–76. He argues that the court erred on both counts, and we agree.

## A.

First, the so-called neutral reporting privilege. According to the trial court, Florida law shields "disinterested communications of matters of public concern" by "members of the media" from defamation suits. *Id*. at 1276 (quoting *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998)). The parties contest whether Bloomberg's reporting of Sepúlveda's claims falls under that doctrine. But this defense fails for a more basic reason: Florida courts do not recognize it.

Bloomberg invokes a variety of lower court decisions that it says reflect the existence of this privilege. But the Florida Supreme Court is the first place we look to understand state law. *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Although that court has not addressed the issue for public figures, it has declined to adopt a similar privilege in the context of private-figure plaintiffs. *Miami Herald Publ'g Co. v. Ane*, 458 So. 2d 239, 241–42 (Fla. 1984). And Florida did recognize a "'fair comment' qualified privilege" for suits by public figures, but it "was always defeated by express malice, a lesser standard than" actual malice. *Id*. at 242. As a result, that "qualified" privilege is superseded by the First Amendment's even stricter actual malice requirement as announced by the Supreme Court. *Id*. at 240–42.

When, as here, there is no on-point supreme court precedent, we turn to intermediate appellate courts. *Turner*, 879

F.3d at 1262. Bloomberg cites various statements here and there, but no Florida appellate court has directly addressed the issue. For example, the reference to a qualified "fair reporting privilege" in *Woodard v. Sunbeam Television Corp.* is irrelevant because it discusses a separate privilege that extends only to descriptions of official proceedings and reports—a far cry from the privilege for all disinterested media coverage of any newsworthy event that the district court applied here. 616 So. 2d 501, 502–503 (Fla. Dist. Ct. App. 1993). Similarly, *Huszar v. Gross* only recognized a privilege in the contexts of reports "of an official action or proceeding" or "of judicial and quasi-judicial proceedings." 468 So. 2d 512, 515–16 (Fla. Dist. Ct. App. 1985) (quotation omitted). So the intermediate appellate courts too fail to support a neutral reporting privilege in Florida law.

As for the unpublished trial court orders cited by Bloomberg, they are completely irrelevant—we do not look to trial courts in analyzing state law. *See Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1333 (11th Cir. 2004). What we are left with, then, is no state court authority establishing or applying the neutral reporting privilege in Florida. Because Florida defamation law does not include a neutral reporting privilege, we reverse the district court's contrary conclusion.[3]

---

[3] Bloomberg suggests in passing that the First Amendment also provides a neutral reporting privilege. We doubt that very much. Neither the Supreme Court nor this Court has ever joined the "smattering" of jurisdictions that recognize this privilege, and many of our sister circuits have rejected or declined to adopt it. *See, e.g., Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097

**B.**

The district court also held that Florida's pre-suit notice statute for defamation claims procedurally barred Rendón's suit. That question is closer. But we think that the district court went beyond Florida's requirements when it demanded a verbatim list from Rendón. He said enough—barely—to get across the starting line for at least some of his claims.

Florida law mandates that a plaintiff "serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." Fla. Stat. § 770.01. To satisfy this requirement, the "notice must specify the alleged false and defamatory statements contained in the article or broadcast." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1112 (Fla. 2008). And that must happen at least five days before filing an action for libel or slander. *Id.* The "recognized purpose" of this requirement is to enable the publisher "to retract any false statements, or statements contended by the offended party to be false." *Cook v. Pompano Shopper, Inc.*, 582 So. 2d 37, 39 (Fla. Dist. Ct. App. 1991) (quotation omitted). As a result, the pre-suit letter must "specify with particularity" the problematic statements. *Id.* (emphasis deleted and quotation omitted).

To the extent that the district court required more than this standard, it erred in its interpretation of Florida law. The district

---

(4th Cir. 1993); *Dickey v. CBS Inc.*, 583 F.2d 1221, 1225 (3d Cir. 1978); *White v. Fraternal Ord. of Police*, 909 F.2d 512, 528 (D.C. Cir. 1990).

court applied, and Bloomberg advances here, a requirement that Rendón had to specify in the letter the "verbatim" quotations that he objected to. *Rendón*, 403 F. Supp. 3d at 1274–75. But this hurdle appears neither in the text of the notice statute nor in the Florida cases applying it. Instead, it seems to have arisen in federal district court opinions—but we should not impose such a requirement when Florida courts have not done so. *See, e.g.*, *Nelson v. Associated Press*, 667 F. Supp 1468, 1474 (S.D. Fla. 1987) (recognizing a "best possible notice" requirement).

Now to the facts here. Months before filing suit, Rendón sent Bloomberg a letter demanding the retraction of the online and *Businessweek* editions of the article. The letter named the article and its dates of publication. It informed Bloomberg that Rendón believed that the article "falsely stated that Mr. Rendón hired Andrés Sepúlveda to 'rig elections throughout Latin America.'" And Rendón objected to the statements that he had arranged "any of the unlawful and unethical conduct attributed to Mr. Sepúlveda in the Article." He also denied that he had hired Sepúlveda for anything but a single web-design project. In fact, he informed Bloomberg that he objected to the "[f]alse allegations in the Article that Mr. Rendón somehow procured, directed, engaged in, or condoned criminal and/or unethical conduct to 'hack' or 'rig' elections throughout Latin America."

Rendón provided notice at least as specific as that found sufficient by the Florida District Court of Appeal in *Cook*. That case concerned two articles that described a home burglary as "a scene

out of *Miami Vice*." *Cook*, 582 So. 2d at 38. One of those articles quoted a police officer as saying that "drugs may have been involved." *Id*. The homeowners were not happy. They sent two notice letters, the first of which claimed that the articles were "inaccurate as to any involvement with drugs or sale of drugs." *Id*. The second "made reference" to a different letter sent by an assistant city attorney. *Id*. That third-party letter, in turn, clarified that the quoted police officer "did not state that drugs may have been involved in this particular incident, nor was it his intention to insinuate that this was the case." *Id*.

The Florida appellate court concluded that the "combination of the three letters"—the two from the plaintiffs' attorney and one from the assistant city attorney—"adequately 'specified with particularity' the alleged defamatory statements." *Id*. at 40. These letters placed the defendants "on notice that the quotations were the basis for the libel suit so that if" the defendants "so chose, they could retract those quotations to mitigate any damage caused." *Id*.

Rendón's letter provided more notice, describing the crimes that he believed Bloomberg accused him of. While the *Cook* plaintiffs referred only to "involvement with drugs or sale of drugs," Rendón described the crimes he believed Bloomberg accused him of. *Id*. at 38. Rendón also denied the factual basis of the Bloomberg story, whereas the plaintiffs in *Cook* did so only through reference to a third-party letter. *Id*.

Other comparisons tell the same tale. Unlike the notice letter in *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, which was inadequate because there was "no specification as to the statements therein alleged to be false and defamatory," Rendón's letter generally described the statements he objected to and denied that he had hired Sepúlveda for campaign-related cyberattacks or engaged in any election crimes. 316 So. 2d 607, 610 (Fla. Dist. Ct. App. 1975).

Nor is Rendón's letter like the one in *Gannett Florida Corp. v. Montesano*, 308 So. 2d 599 (Fla. Dist. Ct. App. 1975). There, the notice letter merely asserted that an article "imputed a crime to" the plaintiff and attached a copy of the offensive article. *Id.* at 599. Rendón's letter, in contrast, named "rig[ing] elections," "cyberattacks," and "hack[ing]."

The notice Rendón provided likewise exceeded the insufficient notice in *Hulander v. Sunbeam Television Corp.*, 364 So. 2d 845 (Fla. Dist. Ct. App. 1978). Those plaintiffs informed the defendants that they objected to "statements *to the effect*" that they had committed "extortion and bribery." *Id.* at 846. But "[n]owhere in the retraction notice were the allegations, innuendos or intimations identified." *Id.* at 847. Rendón's letter did more. He identified Bloomberg's claims that he hired Sepúlveda to commit "cyberattacks in order to influence the outcome of high-profile political elections" and emphasized that any claim that he hired Sepúlveda to do more than a single web design project was false.

Bloomberg thus had notice that Rendón sought the retraction of those statements. Although Rendón could have provided more detail, he was specific enough to "enable" Bloomberg "to retract" the statements he objected to—the standard set by Florida law. *Cook*, 582 So. 2d at 39.[4]

The story is different for the claims against Robertson and Riley, two of the authors of the article. They received no letter at all—Rendón sent the pre-suit letter only to Bloomberg's and *Businessweek*'s editors-in-chief. The claims against them were properly dismissed. The same is true for the claims regarding the broadcast interviews. The letter only mentions the article and makes no reference to any interviews or broadcasts. Rendón plainly failed to specify either the offending "broadcast[s]" or the "statements" made in them, so these claims too are barred by Florida law.[5] *Id.* (quoting Fla. Stat. § 770.01). We therefore affirm the dismissal of Counts IV, V, VI, and VII.

---

[4] The district court dismissed Count VIII, alleging negligent supervision, because it dismissed all of Rendón's underlying tort claims. *Rendón*, 403 F. Supp. 3d at 1276. Because we conclude that Rendón may pursue three of his defamation claims, we also reverse the dismissal of the negligent supervision claim.

[5] Rather than contest this obvious conclusion, Rendón responds that Bloomberg forfeited its pre-suit notice defense by failing to raise it early enough in the litigation. Rendón's support for this argument, however, is Florida case law. Because conditions precedent are procedural matters usually governed by Federal Rule of Civil Procedure 9(c), we apply that Rule rather than Florida's forfeiture rule grounded in Florida Rule of Civil Procedure 1.120(c). *Cf. Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co.*, 271

\*    \*    \*

Florida law does not recognize the neutral reporting privilege on which the district court relied. And Rendón provided sufficient notice to Bloomberg for his defamation claims arising from the article it published. But he failed to provide notice about the broadcast interview claims or to provide notice to the individual defendants about any of the claims. We therefore **AFFIRM** the dismissal of Counts IV, V, VI, and VII and all counts against the individual defendants. We **REVERSE** the district court's dismissal of Counts I, II, III, and VIII as to Bloomberg. We note that this appeal concerned only the threshold questions of jurisdiction, the pre-suit notice procedural bar, and the existence of an absolute privilege. It may well turn out that the complaint fails to state a claim for other reasons, including failure to allege actual malice. We therefore **REMAND** the case to the district court for further proceedings consistent with this opinion.

---

F.3d 1309, 1317 (11th Cir. 2001); *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1009 (11th Cir. 1982); *Ingersoll v. Hoffman*, 589 So. 2d 223, 224–25 (Fla. 1991). Rendón has offered no reasons to find that Bloomberg failed to timely raise this argument under Federal Rule of Civil Procedure 9(c).